UNITED STATES of America

v.

Randy VILLA, Defendant.

No. 77–CR–131.

United States District Court,
N. D. New York.

Jan. 9, 1979.

George H. Lowe, U. S. Atty. by Joseph Anthony Pavone, Asst., U. S. Atty., Syracuse, N. Y., for plaintiff.

Lasher & Wasserstein, Julius M. Wasserstein, New York City, for defendant.

### MEMORANDUM–DECISION AND ORDER

MUNSON, District Judge.

This opinion addresses the defendant's motion to dismiss an Indictment returned

against him on November 16, 1977. His moving papers assert that the Government's delay, both before and after the return of the accusatory instrument, violate rights secured to him by the Fifth and Sixth Amendments to the United States Constitution, as well as the Northern District Plan For Prompt Disposition of Criminal Cases. While the Court has found that the delay in this case falls dangerously near the period of presumptive harm, the Government's continued prosecution of this matter is neither constitutionally proscribed nor barred by those traditional equitable principles codified in the Northern District Plan.

## I. FACTS

On November 30, 1972, Jay Bottone and Vicki Lynn Ratliffe were arrested for possession and transportation of cocaine by agents of the United States Customs Service at the Champlain, New York Port of Entry. They were subsequently indicted for the violation of federal narcotics laws and, at their arraignment on December 18, 1972, both pleaded not guilty. Three days later, Bottone was released on bail, and Ms. Ratliffe remained incarcerated, entering a change of plea on January 15, 1973. A presentence investigation was ordered; and, during her interview, Ms. Ratliffe disclosed for the first time that an individual known only to her as "Randy" had assisted her and Bottone in making the South American "connection" necessary to obtain the cocaine. Bottone's trial was scheduled for March 28, 1973; however, when he failed to appear, his bail was revoked and a bench warrant was issued for his arrest.

Bottone remained a fugitive until August 23, 1977, when he was arrested in New York City by agents of the Drug Enforcement Administration. After pleading guilty, he provided a full statement identifying and inculpating his coconspirators. Consequently, it was not until October 11, 1977, that Government agents identified the defendant's surname. As the statute of limitations would soon bar any prosecution, an investigation was immediately commenced in an effort to corroborate Bottone's statement. Corroborative proof was then established with respect to the defendant, and on November 16, 1977, the underlying Indictment was returned.

Upon its return, the Indictment was sealed at the request of the United States Attorney. On the record, a cursory justification was given for this action; however, the Assistant United States Attorney who made this application subsequently disclosed that biographical data which was then available suggested that Villa had extensive international contracts, had successfully assisted one of his coconspirators in eluding prosecution for four years, had no substantial ties with any one American community, and moved freely from coast to coast within the United States.

Following this Court's issuance of an arrest warrant, Drug Enforcement Administration agents began their efforts to identify, locate, and apprehend the defendant. Testimony elicited from the case agent responsible for this matter disclosed that the investigation began with Bottone's interview in the Oneida County jail on October 11, 1977. At this time, Bottone disclosed that he and Villa had been arrested in California on drug charges in 1970. In addition to giving a complete account of the underlying transaction, Bottone also revealed that Villa had been sending him money to assist in his exile; and, when Special Agent Lear interviewed the individuals with whom Bottone had been staying in Canada, he was given a phone number where the defendant might be reached. However, pursuit of this lead did not result in additional information.

Because Villa had been associated with the San Francisco and Metropolitan New York areas, the case agent requested investigative assistance from the Drug Enforcement Administration (D.E.A.) offices located in both cities. Agents in New York City reported that the defendant's father was known to the Philippine Embassy. When an agent contacted him under the guise of an old friend searching for Randy's whereabouts, he was informed that the defendant

had two California mailing addresses and an answering service at his recording studio. On January 25, 1978, this information was transmitted to the case agent, as well as the D.E.A. office in San Francisco.

In the meantime, California investigators had located arrest records corroborating Bottone's statement that he and Villa had been picked up on drug charges during 1970. Although their search of the California Department of Motor Vehicles records did not reveal the defendant's current address, the computer did contain his photograph and disclosed that his past traffic tickets had listed a New Jersey mailing address. When Ms. Ratliffe was shown a photographic array, she identified the defendant as the individual named "Randy" with whom she had done business some five years earlier. The case agent then contacted the F.B.I., requesting their assistance, and the California D.E.A. agents began checking the phone number and mailing addresses supplied by the New York City office.

The California investigation was assigned to Special Agent Neal. When he contacted the Pacific Telephone Company security office on January 25, 1978, he was advised that the phone number given by Villa's father had been listed to the Caltronics Security Company, but was no longer in service. As a result, Special Agent Neal did not check the previous billings. If he had, he would have discovered that Randy Villa had been billed for the phone service at 1102 College Avenue in Santa Rosa, California. Nonetheless, the Court finds that Special Agent Neal's decision not to check prior billings was reasonable in these circumstances and would have resulted in no new information, inasmuch as the defendant's father had already informed a D.E.A. agent that his son might be contacted at 1102 College Avenue.

Special Agent Neal pursued his investigation of the College Avenue address by contacting the utility company which serviced that area. Company officials informed him that on January 25, 1978, no utilities were connected at this address. Then, since Agent Neal's office is more than eighty miles from Santa Rosa, he asked the Santa Rosa Police Department to check the College Avenue location. Their investigation disclosed that 1102 College Avenue was not a residence, but an abandoned business. Furthermore, it did not appear to be a recording studio, but a company which sold and serviced security alarm systems. In any event, since it was not visibly in use, no surveillance was set up and the police did not check with the landlord or neighbors in an effort to ascertain whether the defendant had ever been seen there; nor were they subsequently able to apprehend the defendant. Consequently, the only remaining lead was the post office box number given by the defendant's father.

Records of the Postal Inspector's Office indicated that post office box no. 1502 in Santa Rosa, California, had been opened by Randy J. Villa, whose address was listed as 1102 College Avenue.[1] The box was currently in use and, although mail was being picked up several times a week, postal workers could not establish a consistent pattern of receipt. They did, however, indicate that the defendant had been driving a black Volvo when he picked up the mail, and a subsequent license check disclosed that the automobile was registered to a third party. Unfortunately, this information was of little utility since the registration listed the owner's address as Villa's post office box. Full day surveillance of the post office box was therefore conducted by a D.E.A. agent on February 22, 1978, May 9, 1978, and September 18, 1978.

When the first and second surveillances failed to produce positive results,[2] Villa was

1. During the course of his investigation, Special Agent Neal also learned that the defendant had used the name Randy Garcia Villa. In western states, this could further complicate his apprehension since Spanish surnames and middle names are often interchanged.

2. D.E.A. agents had requested that the Postal Inspector's Office conduct a regular surveillance of the defendant's post office box, but they did not possess sufficient manpower to provide such assistance.

declared a D.E.A. fugitive and his name was entered in the National Crime Information Center (N.C.I.C.) data bank during late June or early July of 1978. He was still not apprehended, and when the third postal surveillance and the N.C.I.C. reference failed to result in his arrest, the defendant's father was contacted forthright. Five days later, Randy Villa surrendered to authorities in New York.

The defendant offered no independent testimony during the hearing. Nonetheless, he argues that if D.E.A. agents had checked with the Santa Rosa Junior College, they would have discovered that the defendant had been enrolled there as a student from the Spring of 1975, through the Summer of 1978. Furthermore, the defendant had introduced a Sonoma County Public Library card, likewise suggesting that he might have been located earlier if the special agents had checked with this institution.[3] Finally, the defendant has introduced several telephone bills indicating that the answering service telephone billings had been forwarded to 1102 College Avenue.

█ The defendant has not, however, shown that the college, the telephone company, or the library could have provided information which would have resulted in an earlier apprehension. Indeed, the library card lists the defendant's address as the post office box which D.E.A. agents found to be a fruitless lead. Similarly, the address listed on the telephone billings had already been checked without success. Consequently, the Court finds that the D.E.A. agents did not overlook any investigative leads which would have resulted in an earlier apprehension of the defendant. Moreover, their decision not to confront family members until the postal surveillance had been completed cannot, in these circumstances, be regarded as an abuse of discretion. The Court has, therefore, concluded that the Government's efforts to identify, locate, and apprehend the defendant were conducted with all due diligence.

## II. PRE–INDICTMENT DELAY

█ When charges are pending against him, a criminal defendant may face undue and oppressive incarceration, anxiety and concern attributable to public accusation, interference with his freedom of movement through restraints imposed during pretrial release, public scorn, possible employment disruption, and steadily depleted financial resources. The combined effect of these restraints may diminish the accused's ability to prepare an adequate defense. *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Consequently, the Sixth Amendment guarantees a prompt disposition of the charges against him. The line is, however, drawn at the point where the charges are actually pending. For although a person under investigation may suffer some apprehension or anxiety, his guarantee against pre-Indictment delay rests exclusively upon the applicable statute of limitations and the Fifth Amendment's due process clause. *United States v. Lovasco*, 431 U.S. 783, 789, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977). As a result, pre-Indictment delay will serve as a ground for dismissal only when the defendant demonstrates that the Government failed to obtain an Indictment against him before the applicable statute of limitations has expired or the Government's delay violates "fundamental conceptions of justice," in that it has substantially prejudiced his right to a fair trial or was intentionally incurred to gain some tactical advantage. *United States v. Lovasco, supra* at 790–91, 97 S.Ct. 2044; *United States v. Marion*, 404 U.S. 307, 324, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971); *United States v. Hillegas*, 578 F.2d 453, 457 (2d Cir. 1978); *United States v. Tanu*, 589 F.2d 82 (2d Cir. 1978).

█ Inasmuch as the defendant is charged with a noncapital offense, his prosecution is governed by the five year limitations period set forth in 18 U.S.C. § 3282. The statute requires an Indictment to be "found" in all noncapital cases "within five

3. No proof was offered as to the date when the card was secured or the length of its validity; however, the exhibit shows an expiration date of September, 1979.

years after such offense shall have been committed." Although it may be sealed, an Indictment is "found" within the meaning of this provision when it has been returned by the Grand Jury and filed. *United States v. Cerilli*, 428 F.Supp. 801, 808, aff'd 558 F.2d 697 (3rd Cir. 1977); *United States v. Niarchos*, 125 F.Supp. 214, 232 (D.D.C.1954). The Indictment in this case was filed on November 16, 1977, and the Court must therefore determine whether it was returned within five years after the underlying offense had occurred.

It is well recognized that, for limitations purposes, a criminal conspiracy continues as long as the conspirators engage in overt acts in furtherance of their plot. *Grunewald v. United States*, 353 U.S. 391, 396–397, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957); *Fiswick v. United States*, 329 U.S. 211, 216, 67 S.Ct. 224, 91 L.Ed. 196 (1946); *United States v. Davis*, 533 F.2d 921, 926 (5th Cir. 1976). Consequently, the statute of limitations does not begin to run on a conspiracy charge until the commission of the last overt act in furtherance of the conspiracy. *United States v. Johnson*, 3rd Cir., 165 F.2d 42, cert. den. 332 U.S. 852, 68 S.Ct. 355, 92 L.Ed. 422 (1948); *United States v. Boyle*, 338 F.Supp. 1028, 1036 (D.D.C.1972). Since the attempted border crossing on November 30, 1972, was the last overt act which the conspirators committed in furtherance of their scheme, the present Indictment was returned before the limitations period had run, and this prosecution is not barred by 18 U.S.C. § 3282.[4]

Having found that prosecution is not barred by the applicable limitations period, it is now necessary for the Court to address the defendant's due process claim. As noted earlier, a protracted period of pre-Indictment delay may serve as a ground for dismissal even if an Indictment is returned before the statute of limitations has run. The defendant must, however, demonstrate that continued prosecution would violate fundamental conceptions of justice because the Government's delay was intentionally incurred to gain some tactical advantage or had prejudiced his right to a fair trial.[5] The defendant has satisfied neither of these criteria.

To begin with, none of the credible evidence would suggest that the Government intentionally caused the pre-Indictment delay in a deliberate attempt to gain any tactical advantage. The Government was simply unable to gather sufficient evidence to indict the defendant prior to Bottone's capture. Accordingly, the Court finds that the prosecutorial delay in this case was unintentional and not calculated to gain any advantage, tactical or otherwise, over the defendant.

Courts will not presume the existence of prejudice from the mere fact of delay. *United States ex rel. Solomon v. Mancusi*, 412 F.2d 88 (2d Cir.), cert. den. 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969); *United States v. DeMasi*, 445 F.2d 251 (2d Cir.), cert. den. 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971); *United States v. Stein*, 456 F.2d 844 (2d Cir.), cert. den. 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972). Furthermore, in *United States v. Lovasco*, 431 U.S. 783, 796, 97 S.Ct. 2044, 52 L.Ed.2d 752 (1977), the Supreme Court held that a criminal defendant is not deprived of due process even if his defense is

4. In his closing statement, defense counsel suggested that a shorter limitations period might be applicable to criminal conspiracies insofar as they constitute inchoate crimes. However, Title 18 of the United States Code draws no such distinction; and since limitations questions are fundamentally legislative matters, they may not be lengthened or shortened by judicial fiat. *Toussie v. United States*, 397 U.S. 112, 121, 90 S.Ct. 858, at 863, 25 L.Ed.2d 156, at 165.

5. At this time there is some uncertainty concerning whether the defendant must satisfy either or both of these requirements. See *United States v. Finkelstein*, 526 F.2d 517, 525 (2d Cir. 1975); *United States v. Frank*, 520 F.2d 1287, 1292 (2d Cir. 1975), cert. den. 423 U.S. 1087, 96 S.Ct. 878, 47 L.Ed.2d 97 (1976); *United States v. Brown*, 511 F.2d 920, 922 (2d Cir. 1975); *United States v. Rubinson*, 543 F.2d 951, 961 (2d Cir. 1976). However, since the defendant has satisfied neither of these criteria, this issue need not be reached. *United States v. Finkelstein, supra* at 526.

somewhat prejudiced by prosecutorial delay resulting from an ongoing Government investigation. This holding relies upon rudimentary principles of fairness, explained by the Court as follows:

> In our view, investigative delay is fundamentally unlike delay undertaken by the Government solely "to gain tactical advantage over the accused," *United States v. Marion*, 404 U.S., at 324, 92 S.Ct. 455, precisely because investigative delay is not so one-sided. Rather than deviating from elementary standards of "fair play and decency," a prosecutor abides by them if he refuses to seek indictments until he is completely satisfied that he should prosecute and will be able promptly to establish guilt beyond a reasonable doubt. Penalizing prosecutors who defer action for these reasons would subordinate the goal of "orderly expedition" to that of "mere speed," *Smith v. United States*, 360 U.S. 1, 10, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959). [footnote omitted]

*United States v. Lovasco, supra* at 795–96, 97 S.Ct. at 2051–52. In this case, the defendant has offered not one scintilla of evidence to show that his defense has been prejudiced as a result of the Government's inability to bring him to trial sooner. His only assertions of prejudice are set forth in an attorney's affidavit where it is claimed that the defendant's memory and those of prospective witnesses have faded as a result of the passage of time. But, diminished recollections are not the type of actual prejudice required by *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971). See *United States v. Foddrell*, 523 F.2d 86 (2d Cir. 1975); *United States v. Finkelstein*, 526 F.2d 517, 526 (2d Cir. 1975); *United States v. Payden*, 536 F.2d 541, 544

(2d Cir.), *cert. den.* 429 U.S. 923, 97 S.Ct. 323, 50 L.Ed.2d 291 (1976). The defendant's supporting affidavit also stated that further prejudice would be shown after discovery had been completed, as Mr. Villa expected to find that alibi witnesses or other defense evidence was now unavailable. However, discovery was largely completed before this Court held its evidentiary hearing on November 8, 1978, and the defendant nonetheless failed to offer any evidence in support of these conclusory allegations. Accordingly, the Court can find no specific prejudice to the defense of this case arising from the pre-Indictment delay.

■ The defendant additionally submits that the Government's delay was entirely unjustified because any Assistant U.S. Attorney or Customs Agent assigned to the case [6] could have read the Ratliffe presentence report and learned of the Pugots,[7] who would, in turn, have informed the Government of the defendant's surname and whereabouts. This argument, of course, presupposes that the Pugots would have given this information to the Government. However, there is nothing in the record from which such an inference could be drawn. The argument also presupposes that the presentence report was available to the U.S. Attorney and Government law enforcement officers in 1973. But, this was not the case, because at that point in time, presentence reports were not available to either law enforcement officers or the United States Attorney in the Northern District of New York.[8] For these reasons, the Court cannot assume that the Government could have identified, indicted, and apprehended the defendant any sooner than it did.[9]

---

6. The Drug Enforcement Administration was not in existence at the time of the Bottone-Ratliffe arrest. Instead, the investigation was initially undertaken by the United States Customs Office.

7. The Pugots were allegedly responsible for actually making the South American connection at Villa's request.

8. In 1975 F.R.Crim.P. 32 was amended to require disclosure of presentence reports. Prior

to this time, disclosure was disallowed, even to defense counsel. See 8A Moore's Fed.Prac. 32.03[4].

9. It could be speculated that Bottone's flight, coupled with the inference that the defendant assisted in Bottone's concealment, might place a large responsibility for the pre-Indictment delay upon Bottone and/or the defendant, and hence not be chargeable to the Government. But had Bottone not fled, one would now have to presuppose that he would have disclosed in

 In his next allegation of prejudice, the defendant claims to have been deprived of the tactical advantage of being tried with his coconspirators. However, the due process clause does not guarantee a criminal defendant every conceivable tactical advantage. It merely guarantees a fair trial. Since the defendant cannot identify the manner in which this turn of events has impaired his ability to prove his innocence, this objection does not rise to the level of a constitutional violation. *United States v. Lord*, 565 F.2d 831, 841 n. 10 (2d Cir. 1977). Finally, the defendant asserts that if he had been promptly prosecuted and convicted, he would have enjoyed the benefit of the Young Adult Corrections Act. Yet, even assuming that the Court would have been willing to consider extending the benefits of the Federal Youth Corrections Act to the defendant,[10] it has been recognized in this Circuit that prejudice to a defendant's rehabilitative alternatives will weigh less heavily than the prejudice of an impaired defense. *United States v. Cyphers*, 556 F.2d 630, 636 (2d Cir.), *cert. den.* 431 U.S. 972, 97 S.Ct. 2937, 53 L.Ed.2d 1070 (1977); but see, *United States v. Roberts*, 515 F.2d 642, 646 (2d Cir. 1975). Consequently, inasmuch as the delay in this case was unavoidable and leniency may still be extended at sentencing if the defendant is ultimately convicted, the Court cannot conclude that the pre-Indictment delay in this case has so prejudiced the defense that its continued prosecution would violate fundamental conceptions of justice.

## III. POST–INDICTMENT DELAY

In *Klopfer v. North Carolina*, 386 U.S. 213, 223, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967), the United States Supreme Court acknowledged that the right to a speedy trial is as fundamental as any of the rights secured by the Sixth Amendment. The standards to be applied in conducting a speedy trial analysis were then identified in *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). There, the Court listed four factors which must be examined in determining whether prosecutorial delay has resulted in a Sixth Amendment violation, including: the length of delay, the reasons for it, the resulting prejudice, and the defendant's assertion of his right to a prompt trial. The Court was, however, careful to point out that no single factor was dispositive; and it indicated that the lower courts would still be required to engage in the difficult and sensitive balancing process which had typically been necessary in reviewing speedy trial claims. *Barker v. Wingo, supra* at 533, 92 S.Ct. 2182.

 Although several justices of the Supreme Court have suggested that the Sixth Amendment's rapid trial safeguard should include both pre- and post-Indictment delay,[11] a majority of the courts have not adopted this position. Instead, the present view regarding commencement of Sixth Amendment claims is set forth in *United States v. Marion*, 404 U.S. 307, 92 S.Ct. 455, 30 L.Ed.2d 468 (1971):

> It is either formal indictment or information or else the actual restraints imposed by arrest and having to answer a criminal charge that engage the particular protections of the speedy trial provision of the sixth amendment. *Id.* at 320, 92 S.Ct. at 463.

The majority did, nonetheless, note that the length of delay is to some extent a "triggering mechanism" which may prompt inquiry into the remaining factors. *Id.* at 320, 92 S.Ct. 455.

 In the present case, the post-Indictment delay totalled approximately ten and

---

1973 that which he disclosed in 1977, and further that such disclosure would have been available to be used to indict and apprehend the defendant at that time. Such speculation and conjecture serves no purpose.

10. No proof was offered indicating that such a disposition would have been reasonable under the circumstances. As a result, the Court cannot find that it would have extended such treatment to the defendant had he been convicted at an earlier time.

11. See *United States v. Marion, supra*, 404 U.S. at 331–332, 92 S.Ct. 455, opinion by Mr. Justice Douglas, joined by Mr. Justice Brennan and Mr. Justice Marshall.

one-half months. This period of delay is sufficient to be regarded as presumptively prejudicial, thereby requiring an analysis of the remaining factors.[12] See, e. g., *United States v. Simmons* (9th Cir.), 536 F.2d 827, cert. den. 429 U.S. 854, 97 S.Ct. 148, 50 L.Ed.2d 130 (1976) [6 months]; *United States v. Baumgarten*, 8 Cir., 517 F.2d 1020, 1024, cert. den. 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975) [21 months]; *United States v. Latimer*, 511 F.2d 498, 501 (10th Cir. 1974) [11 months]. Since waiver is not an issue, the Court must balance the reasons for the delay against the prejudice to the defendant.

■ The post-Indictment delay in this case resulted primarily from the difficulty which Government agents experienced in locating and apprehending the defendant. While Mr. Villa has suggested alternative avenues of investigation which might have been pursued, he has not shown that pursuit of these hypothetical leads would have resulted in an earlier apprehension. In fact, as the Court noted at the outset, none of the suggested alternatives would have yielded information which had not already been obtained. Furthermore, although the defendant suggests that he would have surrendered immediately in November of 1977 if his father had been notified of the Indictment, the Court finds that an experienced investigator would not have immediately sought family assistance in light of the facts available at the time this Indictment was returned. Nor would it have been reasonable to seek non sub rosa family assistance at an earlier time, particularly since the information supplied by the defendant's father in response to the ruse telephone call was being investigated and, for all the Government knew, could lead to the apprehension of the defendant without such assistance. Furthermore, it is no answer that the defendant surrendered within five days after his father was informed of the Indictment, as the Government could not have reasonably expected his father's cooperation. The Court therefore concludes that the Government's delay in apprehending the defendant was justifiable and resulted from factors beyond its control.

In large part, the defendant urges the Court to presume actual prejudice from the mere fact and length of the prosecutorial delay in this case. The United States Supreme Court has addressed this contention in dicta:

> No actual prejudice to the conduct of the defense is alleged or proved, and there is no showing that the Government intentionally delayed to gain some tactical advantage over appellees or to harass them. Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment. Events of the trial may demonstrate actual prejudice, but at the present time appellees' *due process claims* are speculative and premature.

*United States v. Marion*, 404 U.S. 307, 325–26, 92 S.Ct. 455, 466, 30 L.Ed.2d 468 (1971). Moreover, the Second Circuit Court of Appeals has repeatedly held that the courts will not presume prejudice from the mere fact of delay. *United States ex rel. Solomon v. Mancusi*, 412 F.2d 88 (2d Cir.), cert. den. 396 U.S. 936, 90 S.Ct. 269, 24 L.Ed.2d 236 (1969); *United States v. DeMasi*, 445 F.2d 251 (2d Cir.), cert. den. 404 U.S. 882, 92 S.Ct. 211, 30 L.Ed.2d 164 (1971); *United States v. Stein*, 456 F.2d 844 (2d Cir.), cert. den. 408 U.S. 922, 92 S.Ct. 2489, 33 L.Ed.2d 333 (1972). As a consequence, the Court is

---

12. In *Barker v. Wingo, supra*, the Court expanded upon the type of prejudice ordinarily considered in a Sixth Amendment claim. This included oppression due to pretrial incarceration, anxiety to the accused, and the possibility of an impaired defense. The defendant's protestations in support of this motion relate only to the last of these elements. There is no claim of oppression due to pretrial incarceration because the defendant is free on bail and he began to endure no anxiety as a result of public accusation until September of 1978 when his father notified him of the indictment.

not free to infer extensive prejudice solely on the basis of the prosecutorial delay in this case.

■ Through his attorney, the defendant also sets forth general allegations of prejudice as a result of fading memories. Of course, diminished memory may not always be reflected in the record since the facts which have been forgotten can rarely be shown. *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972). Yet, as the Court noted earlier, these conclusory allegations are entitled to little weight without additional proof, particularly since the Government has opened its file and the defendant should now be in a position to identify those matters which he and other witnesses have forgotten (as opposed to proving the forgotten facts). Furthermore, he should be in a position to identify which defense witnesses could no longer be located, the substance of their anticipated testimony, and its relevance to his defense. No such evidence was presented despite the defendant's opportunity to offer it. Consequently, the Court can only assume that all of the witnesses, whether called by the Government or the defendant, will experience some difficulty in recalling the underlying events, and finds that the defendant has not shown any particular prejudice to the actual defense of this prosecution.

The defendant's final claim of prejudice relates to an asserted tactical advantage which he lost as a result of not having been indicted with his coconspirators. But again, no showing of substantive prejudice has been made; and this Circuit has indicated that a tactical disadvantage such as this does not amount to the type of prejudice which the Sixth Amendment operates as a safeguard against. *United States v. Lord*, 565 F.2d 831, 841 n. 10 (2d Cir. 1977). Nor can the Court find any prejudice to the defendant as a result of the fact that, if convicted, he could no longer be considered under the Young Adult Corrections Act, because the Sixth Amendment focuses on post-Indictment delay, and he was ineligible for such treatment at the time that he was indicted.[13] Thus, in view of the de minimis prejudice to the defendant and an adequate justification for the Government's delay, the Court finds that the defendant's Sixth Amendment rights have not been violated.

## IV. DISCRETIONARY DISMISSAL

■ In addition to their power to dismiss an Indictment when continued prosecution offends the Fifth or Sixth Amendments, the federal courts also possess inherent power to dismiss a case for want of prosecution. *United States v. Furey*, 514 F.2d 1098, 1103 (2d Cir. 1975). Being an outgrowth of the Court's supervisory authority, this power is independent of Sixth Amendment considerations. Its exercise has traditionally rested in the Court's discretion, *United States v. Aberson*, 419 F.2d 820 (2d Cir.), *cert. den.* 397 U.S. 1066, 90 S.Ct. 1497, 25 L.Ed.2d 687 (1970); and it is now expressly codified in F.R.Crim.P. 48(b). In pertinent part, that rule provides:

If there is unnecessary delay in presenting the charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information or complaint.

In 1974, Congress enacted the Speedy Trial Act P.L. No. 93–619 (Jan. 3, 1975) U.S. Code Congressional & Administrative News, p. 2407, which sets forth procedural guidelines for the prompt disposition of criminal cases. Noncompliance is punishable by dismissal; however, since the new requirements were anticipated to provoke major institutional changes, the legislation provided a phase-in period during which each federal judicial district would accelerate its disposition of criminal cases. Pursuant to these requirements, this Court has adopted a Plan For The Prompt Disposition of Criminal Cases which basically requires the Government to be ready for trial within ninety days after a sealed Indictment has been opened. Rule 7(b)(3), 7(c).

**13.** See Footnote 10.

Because the sanctions of the Speedy Trial Act are not yet applicable, the defendant cannot rely upon its provisions to require dismissal of the Indictment. 18 U.S.C. § 3163(c); *United States v. Carini*, 562 F.2d 144 (2d Cir. 1977). Yet, this holding does not affect the Court's supervisory power to dismiss the accusatory instrument. Rather, the power is now often exercised within the guidelines established by local speedy trial plans. See *United States v. LaCruz*, 441 F.Supp. 1261 (S.D.N.Y.1977).

The present Northern District Plan requires the Government to be ready for trial within ninety days after a sealed Indictment has been opened. §§ 7(b)(3), 7(c). While the Government has indicated its ability to meet these requirements, the defendant argues that the Indictment should nonetheless be dismissed as a discretionary matter because the Government has delayed ten and one-half months in opening an Indictment which was unjustifiably returned and unjustifiably sealed only two weeks before the statute of limitations would otherwise have run. In support of this proposition, he relies upon *United States v. Sherwood*, 38 F.R.D. 14 (D.C.), aff'd sub nom. 348 F.2d 715 (2d Cir.),[14] *cert. den.* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965); also, *United States v. Heckler*, 428 F.Supp. 269 (S.D.N.Y.1976). However, this argument falters at several points. First, the cases upon which the defendant relies are distinguishable; and second, the Indictment was justifiably sealed.

The defendant relies upon *United States v. Sherwood, supra*, for the broad proposition that an Indictment should never remain sealed in excess of ninety days if it is returned shortly before the statute of limitations would otherwise have run. This case is also cited in support of the defendant's claim that, in these circumstances, prejudice to the defense may be presumed as a matter of law, and his reliance is predicated upon the following dicta which itself reveals the distinctive features of the case:

The five-year criminal statute of limitations would have little or no meaning were the law to be construed otherwise. A person would never know with certainty that a sealed indictment might be lurking in undisclosed government files, held in abeyance for a year or years to satisfy the *personal motives* of a government official. To be a nation of law, and not subject to the whims of men, law must be administered uniformly and objectively. The United States of America has sufficient power, prestige, and facilities to openly indict a criminal and bring him to the bar of justice. It is not in keeping with our heritage, to destroy that image of America, by a policy of lying in wait with a sealed indictment, after the criminal statute of limitations has run, waiting for an individual defendant to return across its borders. [Emphasis Added].

*United States v. Sherwood, supra.* Broadly stated, this general proposition is reasonable enough. However, it is important to recognize that *Sherwood* was a securities fraud case in which the Government admitted impounding an Indictment ". . . by reason of circumstances caused by itself or at the behest of someone other than these three defendants, in which the Government [had] acquiesced." *Id.* at 19. Similarly, the dismissal in *United States v. Heckler*, 428 F.Supp. 269 (S.D.N.Y.1976) was predicated upon the Government's failure to establish any justification for sealing the Indictment.

■ Although a conclusory justification was stated on the record at the time that this Indictment was sealed, the Assistant United States Attorney responsible for this prosecution has represented that information available to him at the time the Indictment was returned indicated that the defendant was involved in extensive drug trafficking and had extensive interstate and international mobility. Since the Court finds that these beliefs were reasonable un-

---

**14.** The Indictments were sealed largely at Doyle's behest. The district court denied his speedy trial motion, while granting those of his codefendants. Doyle thereafter pled guilty and sought to raise his speedy trial claim on appeal. The judgment of the lower court was affirmed because Doyle's plea operated as a waiver of his speedy trial claim. 348 F.2d at 719.

der the circumstances and held in good faith, the Government was justified in requesting an Order sealing the Indictment.[15] Furthermore, insofar as I find that these circumstances were not caused or acquiesced in by the Government itself, I find *United States v. Sherwood* and *United States v. Heckler, supra,* inapposite.

Lastly, there can be little doubt that cases decided since *Sherwood* have regarded prosecutorial delay in excess of six months as presumptively prejudicial. *United States v. Simmons,* 536 F.2d 827 (9th Cir.), cert. den. 429 U.S. 854, 97 S.Ct. 148, 50 L.Ed.2d 130 (1977); *United States v. Baumgarten,* 517 F.2d 1020, cert. den. 423 U.S. 878, 96 S.Ct. 152, 46 L.Ed.2d 111 (1975); *United States v. Latimer,* 511 F.2d 498, 501 (10th Cir. 1974). Yet, in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Court held that presumptive prejudice was not in itself dispositive. It merely triggers an inquiry into other factors, the most relevant of which in this case is the reason for the Government's delay. Although *Barker* addressed a Sixth Amendment claim, this balancing process is equally appropriate when the Court is called upon to exercise its traditional supervisory role under Rule 48(b).

As noted earlier, the Government's proof at the evidentiary hearing disclosed an adequate justification for the delay in this case. The defendant, on the other hand, offered no evidence of actual prejudice to his defense; nor did the Government's delay impose those hardships ordinarily associated with neglected accusations. Accordingly, the defendant's motion to dismiss shall in all respects be denied.

It is so ordered.

---

**15.** It is well recognized that an Indictment may be sealed when there is a risk of flight should the defendant learn of the pending charges prior to his apprehension. *United States v. Smaldone,* 484 F.2d 311, 320 (10th Cir.), cert. den., 415 U.S. 915, 94 S.Ct. 1411, 39 L.Ed.2d 469 (1974). However, since sealing an Indictment has a tolling effect under the Northern District Plan and the Speedy Trial Act, I shall henceforth require the Assistant U.S. Attorney to state the basis for this request on the record and shall limit the impounding order to six months, at which time the Government may reapply for an extension.