Richard CANTOR and Amerigard Alarm & Security Corporation, f/k/a Life Alert Systems, Inc., Plaintiffs,

v.

LIFE ALERT, INC., Jerry Schubert, David Novic, National Alarm Computer Center, Inc., Alert Computer Emergency Co., Defendants.

85 Civ. 6210 (CBM).

United States District Court, S.D. New York.

Jan. 23, 1987.

---

Steven Storch, Munves, Tenenhaus & Storch, P.C., New York City, for plaintiffs.

Robert Anderson, Boyle, Vogeler & Haimes, New York City, for defendants.

## OPINION

MOTLEY, District Judge.

Defendants Jerry Schubert, Alert Computer Emergency Company ("ACECO"), and National Alarm Computer Center, Inc. ("National") move for an order pursuant to Federal Rules of Civil Procedure 12(b)(2), (3) and (6) dismissing plaintiff's claims for lack of personal jurisdiction, expiration of the applicable statute of limitations, failure to state a claim upon which relief can be granted, and improper venue.

FACTS

This action arises from an unhappy dealership relationship between plaintiffs and defendants, in which plaintiffs purchased a dealership for defendants' medical alarm products. The facts as plaintiffs allege them are as follows.

Plaintiff Richard Cantor learned of the opportunity to become a dealer of defendant Life Alert's medical alarm products from an advertisement defendant placed in the *Wall Street Journal.* The medical alarms would be installed in private homes and monitored at a central station in California by ACECO, a company related to Life Alert. Life Alert was selling such dealerships nationwide, and the State of New York was a prime marketing area. Cantor met with defendant David Novick, president of Life Alert, in New York to discuss the dealership arrangement, and decided to purchase the dealership rights to a portion of Manhattan. Cantor signed the dealership purchase agreement (the "Pur-chase Agreement") in California on August 28, 1978.

Under the Purchase Agreement, Life Alert promised to provide extensive support to the holder of the dealership in the form of both goods and services. In return for the dealership rights to a portion of Manhattan, Cantor paid Life Alert $8,970.00. In addition, Cantor paid $1,000.00 for an option to purchase rights to the remainder of Manhattan.

Cantor then learned that Life Alert had purportedly sold the rights to the remainder of Manhattan to another dealer. To protect his interest in the Manhattan market, Cantor exercised his option to purchase exclusive rights to the area on December 19, 1978 and paid Life Alert an additional $11,960.00 for the dealership of the remainder of Manhattan. Cantor then assigned his rights to plaintiff Amerigard Alarm and Security Corporation ("Amerigard").

Life Alert shipped several units to Cantor in New York; however, by early 1979 it had become apparent to Cantor that the support Life Alert had promised would not be forthcoming. Cantor complained to Life Alert about its failure to comply with the Purchase Agreement on numerous occasions between April and August of 1979. Finally, on August 8, 1979, Cantor threatened to take legal action if Life Alert did not repurchase the dealership.

To forestall this action, both Novick and defendant Jerry Schubert, vice president of Life Alert, agreed by telephone to repurchase the dealership over a one-year period. Cantor's lawyers in New York drew up a contract for the repurchase by Life Alert of Cantor's interest. Cantor signed the contract in New York (the "Second Agreement") and sent it to California, where Schubert signed it on behalf of Life Alert. The agreement was executed on August 10, 1979.

The Second Agreement provides for the sale of Cantor's interest to Life Alert for $22,425. The contract also provides for payment over a one-year period as Life Alert sold portions of the Manhattan dealership to others. The portion of the con-

tract dealing with the payment procedure reads as follows:

> E. The Company [Life Alert] will compensate the dealer [Cantor] in the following manner:
>
> (1) As "territories" are sold, the Company will forward one half of the "territory price", which is one half of $2990 equalling $1495, to the Dealer and retain the remainder for itself. This formula will be used consistently throughout so that whether "territories" are sold individually or in blocks, for each "territory" of 100,000 population sold the Company will forward $1495 to the Dealer.

Schubert Affidavit, Exhibit E.

After this Second Agreement was executed, Cantor wrote on a number of occasions to Schubert and Novick to inquire about progress on the performance of the contract. Finally, on August 6, 1980, Schubert told Cantor that neither he nor Life Alert had any intention of performing under the agreement. Schubert also told Cantor that he had nothing to do with Life Alert, that Cantor's contract was with Novick alone, and that Schubert had no idea where Novick could be located.

Cantor has since learned that the California Secretary of State had effectively shut down Life Alert's operations as of December 19, 1978, months prior to execution of the Second Agreement. See Storch Affidavit, Exhibit B (order extending Desist and Refrain order). Plaintiffs also allege that corporate formalities were not followed among defendant corporations Life Alert, ACECO, and National, nor were they followed in the relationships between the corporations and their owners, who include defendants Novick and Schubert. Life Alert was operated to fund ACECO, whose funds were later funneled into National. Each of these corporations was simply a shell set up for the benefit of Novick and Schubert, according to plaintiffs.

On August 9, 1985, plaintiffs brought the above-captioned action against defendants, claiming both civil RICO violations and common law fraud.

## I. Statute of Limitations.

Plaintiffs have disclaimed any action for common law fraud that might arise from the original Purchase Agreement. Plaintiffs' Memorandum in Opposition at 8. Defendants do not contend that plaintiffs' claims under the Second Agreement (dated August 10, 1979) are barred by the statute of limitations. Defendants' Reply Memorandum in Support at 3. Therefore, the court is faced only with the question of whether plaintiffs' RICO claim as it relates to the Purchase Agreement is barred by the applicable statute of limitations.

■ The RICO statute does not contain a statute of limitations for private civil actions. The length of the limitations period must be determined by referring to state law. Arneil v. Ramsey, 550 F.2d 774 (2d Cir.1977). The parties agree that the applicable limitations period is six years, as provided by N.Y.Civ.Prac.Law and Rules Sections 213(8) and 203(f).

■ While state law determines the limitations period, federal law determines when the period begins to run. Id. Under federal law, the period begins to run when the plaintiff becomes aware of the fraud or at the time when the plaintiff should have discovered the fraud. Id.; Anisfeld v. Cantor, 631 F.Supp. 1461 (S.D.N.Y.1986); Seawell v. Miller Brewing Co., 576 F.Supp. 424, 427 (M.D.N.C.1983).

■ Plaintiffs contend that the RICO statute of limitations begins to run from the last racketeering act, relying on U.S. v. Field, 432 F.Supp. 55 (S.D.N.Y.1977) aff'd 578 F.2d 1371 (2d Cir.1978) cert. dismissed 439 U.S. 801, 99 S.Ct. 43, 58 L.Ed.2d 94 (1978). This reliance is misplaced, however, because Field is a criminal RICO case. The rules governing accrual of conspiracy claims in criminal cases have traditionally been different from those governing accrual in civil cases. For example, under 18 U.S.C. Sec. 3282, the statute of limitations does not begin to run on a criminal conspiracy charge until the last overt act in furtherance of the conspiracy is committed. See, e.g., U.S. v. Villa, 470 F.Supp. 315 (S.D.N.Y.1979); U.S. v. Culuso, 461

F.Supp. 128 (S.D.N.Y.1978) *aff'd* 607 F.2d 999 (2d Cir.1979). By contrast, the settled rule in civil conspiracies is that the statute of limitations begins to run after commission of the first overt act causing damage. *See Lowell Wiper Supply Co. v. Helen Shop, Inc.*, 235 F.Supp. 640, 644 (S.D.N.Y. 1964) (collecting cases).

■ It is clear from plaintiffs' complaint that plaintiffs were aware of the fraud allegedly perpetrated on them in connection with the Purchase Agreement well before the Second Agreement was executed on August 10, 1979. Since plaintiffs did not file their RICO claim until August 9, 1985, the six-year statute of limitations had run at that time, and plaintiff's RICO claim must be dismissed as it relates to the Purchase Agreement.

## II. Personal Jurisdiction.

■ Defendants also move to dismiss for lack of personal jurisdiction. Since an evidentiary hearing has not been conducted on this point, plaintiff need make only a *prima facie* showing that this court has personal jurisdiction over the moving defendants. *Marine Midland Bank v. Miller*, 664 F.2d 899, 904 (2d Cir.1981).

Under Rule 4(e) of the Federal Rules of Civil Procedure, a district court sitting in New York State must apply New York law to determine whether it has personal jurisdiction over a defendant. *Arrowsmith v. United Press International*, 320 F.2d 219, 223 (2d Cir.1963) (en banc). Plaintiff asserts jurisdiction under three provisions of New Yorks' long-arm statute, N.Y.Civ. Prac.Law and Rules Sections 302(a)(1), 302(a)(2), and 302(a)(3). Since the court finds that plaintiff has made a *prima facie* showing of jurisdiction over both Schubert and ACECO under 302(a)(3), only this ground for jurisdiction is discussed in detail below. The clear lack of personal jurisdiction over National under any of the grounds plaintiff proposes is discussed at the end of this section.

In relevant part, N.Y.Civ.Prac.Law and Rules Sec. 302(a)(3) grants New York courts personal jurisdiction as follows:

As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nondomiciliary ... who in person or through an agent ... commits a tortious act without the state causing injury to person or property within the state, ... if he ... expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce.

■ A commercial tort may be a "tortious act" within the meaning of Sec. 302(a)(3). *Sybron Corp. v. Wetzel*, 46 N.Y.2d 197, 295, 413 N.Y.S.2d 127, 131, 385 N.E.2d 1055, 1058 (N.Y.1980). Misrepresentation, resulting in commercial harm, is a tortious act within the meaning of the statute. *Hargrave v. Oki Nursery, Inc.*, 636 F.2d 897, 899 (2d Cir.1980). Simply because a set of acts may constitute breach of contract does not mean that they cannot also give rise to liability in tort and provide the predicate for personal jurisdiction under Sec. 302(a)(3). *See Id* at 898–99. Therefore, plaintiff's contention that defendants caused injury in New York when plaintiffs were defrauded by the Second Agreement provides a cognizable basis for jurisdiction under Sec. 302(a)(2).

■ Sec. 302(a)(3) also requires that one over whom jurisdiction is exercised "expect[ ] or should reasonably expect the act to have consequences in the state." One should reasonably expect a fraudulent agreement to repurchase a Manhattan dealership to have consequences in New York State. This is particularly true in this case, since the Second Agreement clearly contemplates a complex repayment procedure in which Life Alert was to make payments over a period of time, as Life Alert divided up the Manhattan territory and sold it to others.

Defendants contend that while Life Alert and Novick might have performed acts that would provide a basis for jurisdiction, the moving defendants have performed no such acts. To assert *in personam* jurisdiction over each of the moving defendants, the court must determine that plaintiff has

made a *prima facie* case that each of them *individually* committed a tort either in person or through an agent that is cognizable as the predicate for jurisdiction in New York, and that each "derives substantial revenue from interstate or international commerce," as required by Sec. 302(a)(3). Jurisdiction over each of the defendants is, therefore, discussed below.

*A. Schubert.*

Defendant Schubert, a citizen of California, signed the Second Agreement as vice president of Life Alert. Defendants claim that he did so only in his capacity as a corporate officer and, therefore, is shielded from jurisdiction based on this act by New York's fiduciary shield doctrine.

▉ The fiduciary shield doctrine insulates corporate employees from suit in New York when their only contacts with the state were in their corporate, as opposed to their personal, capacity. *See, e.g., Marine Midland Bank v. Miller*, 664 F.2d 899, 902 (2d Cir.1981); *Laufer v. Ostrow*, 55 N.Y.2d 305, 449 N.Y.S.2d 456, 434 N.E.2d 692 (N.Y.1982). The doctrine may be applied where, as is alleged here, a corporate official commits a tort outside New York that causes injury within New York. *See, Sheldon v. Kimberly Clark Corp.*, 105 A.D.2d 273, 482 N.Y.S.2d 867, 869 (1984).

▉ The rationale for the fiduciary shield doctrine is that it would be unfair to force an individual to defend a suit brought against him personally in a forum state where he does not reside and where his only relevant contacts are acts he performed for his employer rather than for his own personal benefit. *Marine Midland Bank v. Miller*, 664 F.2d at 902. The doctrine must be applied both equitably and flexibly, and should not be used to shield corporate wrongdoers acting for their own benefit. *See Lorenzo v. Goldman*, 96 A.D.2d 852, 465 N.Y.2d 779, 780 (2nd Dep't 1983). Thus, if a corporation is merely a shell operated for the benefit of its owners, an employee-owner is not shielded by the doctrine if his actions were taken in his own interest. *Marine Midland Bank*, 664 F.2d at 903.

▉ Plaintiffs have made a *prima facie* showing that Life Alert was such a shell corporation, and that Schubert was acting for his own personal benefit in allegedly defrauding plaintiffs when he executed the Second Agreement in Life Alert's name. Plaintiffs allege that no stock was ever issued for the corporations and that Novick and Schubert distributed to themselves or ACECO money from Life Alert proceeds. They also allege that defendants Novick and Schubert assumed corporate titles as was convenient for their immediate purposes; for example, Schubert signed the Second Agreement as an officer of Life Alert when Life Alert no longer existed and Novick signed the desist and refrain order on behalf of Life Alert when he had supposedly severed all connections with the company. Furthermore, plaintiffs have substantiated these allegations with deposition testimony given by the defendants and other corporate officers in connection with an action brought in California by others against defendants. *See* Storch Affidavit, Exhibit C, Novick transcript at 65–70, 71–73, 74, 75, 76–77, 80–81, 84–88, and 89; Exhibit E, Perry transcript at 24–25, 54–57, 85–86, 89–91, 94–99, 100–02, 106–07, and 108–09; Exhibit A, Schubert transcript at 36–38, 94–95, 98. Therefore, Schubert may not hide behind the fiduciary shield to avoid personal jurisdiction at this stage of the proceedings.

▉ In addition, plaintiffs have made a *prima facie* showing that Schubert "derives substantial revenue from interstate or international commerce," as required by the Sec. 302(a)(3). Plaintiffs have alleged that Life Alert, through Novick and Schubert, solicited dealerships and customers throughout the United States, and had sold a number of dealerships around the country. In fact, Life Alert had sold a number of dealerships in the New York area alone, and solicited heavily in the the state. *See* Storch Affidavit, Exhibit C, Novick Transcript at 127–29; Exhibit A, Schubert transcript at 91; Exhibit D, list of sales leads in New York. In addition, plaintiffs allege that both Life Alert and ACECO operated nationwide. *See, e.g.,* Storch Affidavit, Ex-

hibit E, Perry transcript at 18. As discussed above, since plaintiffs have properly alleged that Life Alert and ACECO are shell corporations, the interstate business dealings of the two companies may be attributed to Schubert for the purpose of showing that he derives substantial revenue from interstate commerce.

### B. ACECO.

■ ACECO is a California corporation established to monitor the alarms that Life Alert dealers sold. ACECO was owned and controlled by the same individuals who owned and controlled Life Alert. According to Novick, ACECO was to be the company that made the money, while Life Alert was "probably a break even situation." Storch Affidavit, Exhibit C, Novick transcript at 34. Furthermore, plaintiffs allege that money raised by Life Alert through the sale of dealerships was simply funnelled into ACECO. Plaintiff substantiates that claim by pointing to the following excerpt from the deposition of defendant Novick.

Q   And it's my understanding from looking at the checks and from your earlier testimony this morning that ACECO relied heavily for these front end costs on moneys it obtained from Life Alert, which Life Alert in turn obtained from selling units to distributors?

A   Yes.

Q   And as far as you know, these moneys that Life Alert advanced to ACECO were never paid back to Life Alert; isn't that right?

A   Yes.

*Id.* at 107.

Thus plaintiff has alleged facts that indicate that Life Alert and Schubert were acting as ACECO's agent, within the meaning of Sec. 302(a), when they allegedly defrauded plaintiffs in the Second Agreement.

■ Plaintiff has also made a *prima facie* showing that ACECO derives substantial revenue from interstate commerce in its allegations that ACECO monitored medical alarms around the country and charged fees for this service. *See, e.g.,*

Storch Affidavit, Exhibit E, Perry transcript at 18.

### C. National.

National is also a California corporation, which plaintiffs allege is a successor corporation to ACECO. Plaintiffs do not allege any acts that National committed personally which can serve as the basis for long-arm jurisdiction under either Sec. 302(a)(3) or the other subsections of Sec. 302(a) that plaintiffs assert grant this court jurisdiction over defendants. They assert, rather, that the acts of Life Alert and others may be attributed to National for jurisdictional purposes.

■ The acts of others may be attributed to National for jurisdictional purposes only if these others were acting as National's agents. *See Grove Press, Inc. v. Angleton,* 649 F.2d 121, 122 (2d Cir.1981). For such an agency relationship to exist, the alleged agent must have acted for the benefit of, with the knowledge and consent of, and under some control by, the principal. *Id.*

■ However, it is uncontroverted that National was not incorporated until January 22, 1980, Schubert Affidavit at 3, almost six months after the Second Agreement was executed. Plaintiffs do not allege that any of the defendants or their agents committed acts that could serve as the basis for jurisdiction while National was in existence. Life Alert and the other defendants could not have been acting as National's agents at a time when National did not exist. Therefore, it cannot be said that National committed any act, either in person or through an agent, that would provide the basis for jurisdiction over it in this action under sections 302(a)(1), 302(a)(2), or 302(a)(3).

### III. Failure to State the Circumstances Constituting Fraud With Particularity.

Rule 9(b) of the Federal Rules of Civil Procedure requires that circumstances constituting fraud be stated with particularity. The rule allows malice, intent, knowledge,

and other conditions of mind to be averred generally. Failure to comply with rule 9(b) renders a complaint vulnerable to dismissal. *See Connecticut National Bank v. Fluor Corp.*, 808 F.2d 957 at 962 (2d Cir. 1987). Defendants contend that plaintiffs' claim for fraud must be dismissed because plaintiffs have failed to allege that defendants entered into the Second Agreement with no intent to perform.

■ The five elemements of a claim for fraud in New York are misrepresentation of a material fact, falsity of that representation, scienter, reliance, and damages. *Mallis v. Bakers Trust Co.*, 615 F.2d 68, 80 (2d Cir.1980). While a situation in which a party enters into a contract intending not to perform can constitute fraud, intention not to perform is not a necessary element of a cause of action for fraud under New York Law. One who fraudulently induces another to enter into a contract through material misrepresentation is properly charged with fraud, whether or not he or she intended at the time eventually to perform the contract. Thus it was not necessary for plaintiffs to have alleged that defendants entered into the contract without intending to perform.

■ Plaintiffs have alleged fraudulent misrepresentation with sufficient particularity to satisfy the requirements of Rule 9(b) in paragraph 26 of their complaint, which states:

On information and belief, defendants induced Cantor and Amerigard to enter into the Second Agreement in that

(i) defendants failed to disclose that, prior to execution of the Second Agreement, on information and belief, Life Alert and Novick had been previously barred from selling Life Alert Dealerships in the State of California.

(ii) on information and belief, defendant had no intention of continuing with the business of Life Alert.

Plaintiffs have also alleged that defendants knew their representations to be false, Complaint at para. 32, and that plaintiff Amerigard entered into the Second Agreement in reliance on defendants' representations, Complaint at para. 33. Plaintiffs' allegation of fraud is thus sufficient to withstand a motion to dismiss.

■ In their reply memorandum, defendants also urge that plaintiffs' fraud claim be dismissed because plaintiffs have failed to allege that they suffered a detriment as a result of their reliance on defendants' misrepresentations. As a preliminary matter, the court notes that defendants should not have brought up this new issue in a reply memorandum, giving plaintiffs no opportunity to respond. However, in any event, defendants' contention is incorrect. Plaintiff alleged damage as a result of the fraud in paragraph 35 of the complaint, which reads as follows:

As a result of defendants' wrongful acts and omissions, Amerigard has been damaged in an amount presently unknown, but in excess of $10,000.

This allegation of damage is sufficient to withstand a motion to dismiss.

*IV. Venue.*

Defendants also move for dismissal on the ground that the Southern District of New York is the improper venue for this action because of a forum selection clause in the Purchase Agreement that makes the federal district court in Orange County, California the proper venue for actions arising from that agreement. This argument is no longer valid because of the way in which this action has been narrowed.

■ First, as noted above, plaintiffs have disclaimed any action for common law fraud that might arise from the original Purchase Agreement. Second, plaintiff's RICO claim, which included allegations connected with the Purchase Agreement, is dismissed pursuant to this opinion. Therefore, the only claims remaining in the lawsuit arise from the Second Agreement, not from the Purchase Agreement. Thus the forum selection clause in the Purchase Agreement does not control the proper venue for this action.

CONCLUSION

Plaintiff's RICO claim is dismissed as barred by the statute of limitations. De-

fendant National Alarm Computer Center is dismissed from this action as a defendant because this court lacks personal jurisdiction over it. Defendants' motion to dismiss Schubert and Alert Computer Emergency Company for lack of personal jurisdiction, their motion to dismiss the fraud claim under Rule 9(b), and their motion to dismiss the action for improper venue are denied. Defendants' request for costs, disbursements, and attorney's fees in connection with this motion is also denied.