In re UNION CARBIDE CORPORATION CONSUMER PRODUCTS BUSINESS SECURITIES LITIGATION.

No. MDL 692 (CLB).

United States District Court, S.D. New York.

July 31, 1987.

---

Jerome M. Congress, Milberg Weiss Bershad Specthrie & Lerach, New York City, for Sy Richard Lippman and Ralph R. Scott.

Daniel W. Krasner, Wolf Haldenstein Adler Freeman & Herz, New York City, Richard D. Greenfield, Greenfield & Chimicles, Haverford, Pa., Larry A. Sucharow, Goodkind, Wechsler, Labaton & Rudoff, Harvey Greenfield, New York City, for Harry Abrevaya, Evelyn H. Summers and Charles S. Tanenbaum.

Dianne M. Nast, Kohn, Savett, Klein & Graf, P.C., Philadelphia, Pa., Elwood S. Kendrick, Elwood S. Kendrick, Inc., Los Angeles, Cal., for Selden Ring.

Kenneth H. Hanson, Chicago, Ill., for Richard James Stevens.

Raymond L. Falls, Denis McInerney, David R. Hyde, Kevin J. Burke, Ronald I. Keller, Cahill Gordon & Reindel, New York City, for Union Carbide Corp., Warren M. Anderson, John J. Creedon, Roberto DeJesus Toro, Harry J. Gray, James M. Hester, Jack B. Jackson, Horace C. Jones, Robert D. Kennedy, Ronald L. Kuehn, Jr., C. Peter McColough, William S. Sneath, J. Clayton Stephenson, Heinn F. Tomfohrde, III, Russell E. Train, Kathryn D. Wriston and Alec Flamm.

Bartlett H. McGuire, Jo Backer Laird, Jacqueline O. Stern, Douglas I. Brandon, Davis, Polk & Wardwell, New York City, for Morgan Stanley & Co.

Stuart L. Shapiro, Henry P. Wasserstein, Anne W. Crawford, David E. Bamberger, Skadden, Arps, Slate, Meagher & Flom, New York City, for First Boston Corp., First Boston, Inc. and First Boston Acquisition Holdings, Inc.

John S. Martin, Jr., Janet Neustaetter, Schulte Roth & Zabel, New York City, for Alfred E. Dudley and Alan C. Egler.

## MEMORANDUM AND ORDER

BRIEANT, Chief Judge.

This securities class and derivative litigation was transferred to the Southern District of New York by the Judicial Panel on Multidistrict Litigation on August 14, 1987, pursuant to 28 U.S.C. § 1407, for coordinated or consolidated pretrial proceedings. This Court on September 11, 1986 entered Pretrial Order No. 1, approving plaintiffs' steering committee as lead counsel and certifying other ministerial and procedural matters. Since that time, the parties have engaged in substantial pretrial discovery, with the cut-off date for merits discovery

extended, by Stipulation and Order filed June 16, 1987, to September 30, 1987 and for expert witness discovery to November 30, 1987.

Defendant Union Carbide ("Carbide"), on behalf of the Corporation and the individually named directors and officers,[1] has moved to dismiss pursuant to Rule 12(b)(6), F.R.Civ.P., for failure to state a claim, or in the alternative, for summary judgment pursuant to Rule 56, F.R.Civ.P.[2] Defendants First Boston Corporation, First Boston, Inc. and First Brands Corporation (sued herein as First Boston Acquisition Holdings, Inc.) ("First Boston"); Morgan Stanley & Co. Incorporated ("Morgan Stanley"); and the individual defendants Alfred E. Dudley and Alan C. Egler, who were officers of the Home and Automotive ("H & A") division of Union Carbide during the relevant time periods; move separately to dismiss on several grounds, or in the alternative, for summary judgment incorporating the briefs and arguments of Union Carbide. Oral argument on these motions was held on April 28, 1987, and a specimen of the Rights Certificate central to this action was submitted by counsel for Union Carbide on May 14, 1987. After supplemental submissions essentially comprised of a series of correspondence among the parties and with the Court as to additional facts disclosed or confirmed through ongoing discovery, these motions were fully submitted for a decision on July 7, 1987, with the filing of a letter to the Court from plaintiffs' liaison counsel in response to additional arguments proffered by defendant Union Carbide via letter filed June 24, 1987.

*Summary of the Claims*

Plaintiffs bring this litigation as a class action[3] under provisions of federal securi-

---

**1.** Warren M. Anderson, John J. Creedon, Roberto De Jesus Toro, Harry J. Gray, James M. Hester, Jack B. Jackson, Horace C. Jones, Robert D. Kennedy, Ronald L. Kuehn, Peter McColough, William S. Sneath, J. Clayton Stephenson, Heinn F. Tomfohrde, III, Russell E. Train, Kathryn D. Wriston and Alec Flamm.

**2.** An additional ground raised as to the director and officer defendants, to dismiss on Rule 12(b)(5) of the F.R.Civ.P., for insufficiency of service of process, was resolved by the parties

and withdrawn at the time of oral argument before this Court.

**3.** The purported class has not been certified by this Court. Plaintiffs' motion for class certification, jointly opposed by all of the defendants, will be argued subsequent to the disposition of all motions of the defendants to dismiss or for summary judgment. The plaintiffs seek to certify a class which would consist of: "all persons (other than the defendants and members of their immediate families and entities or trusts which they control) who received and/or pur-

ties law and pendent state law on behalf of all persons who received the original issue of approximately 31 million Rights from Union Carbide on March 3, 1986, or subsequently purchased such Rights on the open market, and who continue to hold such Rights to their detriment allegedly as a result of the conduct charged.

The facts, alleged or represented by the plaintiffs, which must be taken as true for the purpose of resolution of the within motions, are as follows. The Union Carbide Rights were created, and issued without cash consideration, to common shareholders of Carbide as an outgrowth of a power struggle during which the Union Carbide management and directors sought to avoid a takeover of the company as a result of a public tender offer by the GAF Corporation ("GAF"). In response to an offer by GAF to acquire Carbide shares at $78.00 per share, a price publicly claimed by Union Carbide management to be grossly unfair and less than true value, at a meeting on January 2, 1986, Union Carbide's Board of Directors decided as part of its strategy to resist GAF, to sell its two major Consumer Products businesses and to distribute the proceeds of these sales to shareholders as a special dividend payable on March 1, 1986. It was also determined at this meeting, and announced publicly by Letter to the Shareholders dated January 2, 1986 and Supplement dated January 3, 1986 (Exhibits B and C, respectively, to Fusaro Aff. of Union Carbide), that if the Consumer Products businesses were not sold by March 1, 1986, holders of record as of February 15, 1986 would receive transferable Rights which would enable the holder to realize such proceeds upon sale.

The sale of the Consumer Products businesses, comprised of two divisions, Home and Automotive Products and Battery Products, was not accomplished by March 1, 1986. In consequence, on March 3, 1986, Union Carbide issued transferable and marketable Rights Certificates to all persons who were shareholders of record of Union Carbide as of February 15, 1986, which entitled the holder to a pro rata share of the proceeds from the sale of the Consumer Products businesses. This special cash dividend was to be equal, in the aggregate, to the difference between the pretax net sale proceeds and the net book value of the Consumer Products business at the time of sale (Complaint para. 36).[4] The Rights Cer-

chased certain Union Carbide Corporation Rights and who were damaged as a result of the conduct complained of in these actions" (Plaintiffs' Motion for Class Certification at 1-2).

**4.** The Rights Agreement, dated March 1, 1986 (Exhibit D to Affidavit of Robert F.X. Fusaro, Motion of Defendant Union Carbide) and incorporated by reference into the Rights Certificates, summarized the resolution of the Board of Directors:

"WHEREAS, on January 2, 1986 the Board of Directors of the Company declared a special cash dividend equal, in the aggregate, to the distributable value of the Consumer Products Business (as hereinafter defined) payable on the shares of Common Stock of the Company held of record on February 15, 1986, such dividend to be paid on March 1, 1986;

WHEREAS, the Company is required to repay certain indebtedness of the Company in the amount of the estimated net book value ($1.1 billion) of the Consumer Products Business upon the sale thereof;

WHEREAS, as part of such declaration, the Board determined that if the sale of the Consumer Products Business had not closed as of March 1, 1986, the dividend paid on such date would take the form of a right to receive the amount of the dividend in cash upon the sale or sales of the Consumer Products Business (a 'Right');

WHEREAS, the sale of the Consumer Products Business will not occur by March 1, 1986 ...."

(Rights Agreement at 1). The Rights Agreement set forth the formula for payment after sale of the Consumer Products businesses, in part, as follows:

"2.1 If the Company sells the Consumer Products Business at one time, the Company will pay the Total Dividend after the Company receives the Net Sale Proceeds.

2.2 The Company may sell the Consumer Products Business in parts at different times. In that case, the Company will pay a Partial Dividend after the Company receives the Net Sale Proceeds for the sale of such part. If the Consumer Products Business is sold in more than one transaction, the amount of the Partial Dividend payable on account of each transaction shall be the sum of (i) the Net Sale Proceeds form that and all preceding transactions, minus (ii) the amount of any Partial Dividend(s) theretofore paid, minus (iii) the Net Book Value, including, without limitation, any part(s) theretofore sold, and plus or minus, as the case may be, (iv) any amounts to be retained or distributed in accordance with Section 2.4 hereof...."

tificate provided on its face that each Right:

"entitles the registered holder thereof, to receive from Union Carbide Corporation ... from time to time payments in accordance with the Rights Agreement, dated as of March 1, 1986 ... between the Company and Manufacturers Hanover Trust Company, as Rights Agent ..., provided that the final payment hereunder shall only be made after presentation and surrender of this Rights Certificate by hand....

Nothing contained in the Rights Agreement or herein shall be construed to confer upon the holder hereof, as such, any of the rights of a shareholder of the Company or any right to vote for the election of directors or any right to vote for the election of directors or upon any matter submitted to shareholders at any meeting thereof, or to give or withhold consent to any corporate action, or to receive notice of meetings or other actions affecting shareholders, or to receive dividends or subscription rights, or otherwise." (*See* Specimen Security, docketed as No. 56).

These Rights were distributed to shareholders pursuant to a contract between Union Carbide and Manufacturers Hanover Trust Co. ("Rights Agreement", Fusaro Aff. Exh. D). On February 21, 1986 the Rights were listed for trading on the New York Stock Exchange, separately from the Union Carbide shares, and trading began on March 3, 1986 (Memorandum of Defendant Union Carbide at 5–6). The Rights were not registered under the Securities Exchange Act of 1933 ("1933 Act"), one of plaintiffs' many issues tendered in this litigation (Count Two, Complaint para. 57).

In a letter dated March 3, 1986, which accompanied the Rights Certificates, Union Carbide represented to its shareholders that a "competitive bidding process" was presently occurring with respect to the sale of the Consumer Products businesses. However, Union Carbide also represented that the Consumer Products businesses would be sold by means of a process which would "achieve the objective of realizing maximum value for our shareholders while acting in the best interests of employees, customers, and suppliers of these businesses and the communities where they operate" (January 2nd Letter to Shareholders at 3; January 3rd Supplement at 3). Defendant Morgan Stanley conducted the sale by what plaintiffs claim was not a competitive bidding process. Ultimately, defendant First Boston and divisional management through a corporate vehicle, First Brands Corporation, purchased the Home and Automotive business, with the highest bid of $800 million, which was announced on April 21, 1986 (Fusaro Aff.Exh. F). Ralston Purina purchased the Battery Products business for $1.415 billion, announced on April 7, 1986 (Fusaro Aff.Exh. E).

As of October 14, 1986, when the latest distribution of sale proceeds was made, the distribution per Right was $33.22 (*see* Memorandum of Defendant Union Carbide at 7). At that time, the price of Union Carbide stock was $20.875 per share. Taking into account an intervening triple stock split, the value of the package was $62.625 plus $33.22, totalling $95.85 per share/Right. Defendant Union Carbide emphasizes that this figure represents 30 percent more than the final GAF offer (which defendants claim was $74 per share, rather than the $78 value stated by plaintiffs).

In connection with issue of the Rights, plaintiffs claim that Union Carbide and its directors made materially misleading representations to the purported class members

---

2.4 If the amount of any Net Sale Proceeds received by the Company on any closing date is subject to increase or decrease by reason of any post-closing adjustments to such amount (including, but not limited to, post-closing adjustments on account of verification of inventories, resolution of contingent liabilities, etc.), the Company shall have the right to retain from such Net Sale Proceeds, and withhold from distribution, an amount which, in the judgment of the Company, will be sufficient for any repayment that may be due to a purchaser on account of such post-closing adjustment.

Promptly after completion of such post-closing adjustment, any retained amount not repaid to such purchaser shall be added back to the Net Sale Proceeds available for distribution...."

(Rights Agreement at 3–4).

and the investing public concerning the Rights, and agreed to sell the Consumer Products businesses for a grossly insufficient amount in breach of their fiduciary duty. Union Carbide sold these businesses on restrictive terms which included a covenant for the continued employment of certain Union Carbide executives and employees, and a required exclusive long term supply contract with Union Carbide. Defendants Dudley and Egler, Vice President and President of the Home and Automotive division during the relevant times, met "secretly", it is said, with First Boston representatives before and during the bidding process, providing them with more information than was made available to other bidders. Ultimately these executives, using credit obtained for them by First Boston, turned out to be substantial shareholders of the acquisition vehicle. Dudley is currently the President and Chief Executive Officer, and Egler is Consultant and Vice Chairman of the Board, of the resultant company, First Brands. These arrangements and meetings, plaintiffs claim, decreased the sales value of the businesses and thereby breached the "duty" to maintain competitive bidding and to obtain the maximum sales proceeds for the Rights holders. Also it is alleged that the intention to impose these costly conditions of sale was material information omitted from disclosure to the Rights holders.

Plaintiffs also contend that $100 million of the proceeds are being diverted in that Union Carbide is wrongfully deducting this amount as "liabilities and expenses", and has also refused to pay Rights holders any interest for the time period Union Carbide will control those proceeds after sale and before distribution. Further, plaintiffs argue that these Rights should have been registered under the Securities Act of 1933 and thus Union Carbide engaged in the unlawful sale of unregistered securities.

Apart from the claims against Union Carbide, its directors and the officer defendants, plaintiffs charge Morgan Stanley, as Union Carbide's investment banker, and First Boston, as parent of the purchaser of the Consumer Products business, with conspiring and aiding and abetting or benefit-

ting from the alleged unlawful acts and violations by Union Carbide and its officers and directors. The Complaint was dismissed as to Defendant Ralston Purina Company by Stipulation and Order filed November 12, 1986.

The Consolidated Amended Complaint was filed on July 18, 1986. More specifically, it sets forth the following claims:

*Count One:* alleged, as against all of the defendants, that they, "directly and indirectly, singly or in concert, and aiding and abetting one another", engaged in a conspiracy to defraud by certain alleged misstatements and omissions, in violation of Section 10(b) of the Securities Act of 1934 and Rule 10b-5 promulgated thereunder. Plaintiffs charge defendants Union Carbide, its directors and the officer defendants, and Morgan Stanley with the preparation of misleading documents; and defendant First Boston with knowing of such misrepresentations and participating in the sales nonetheless. Due to the above actions, the market price was allegedly artificially inflated, with the Rights now valued at $32 to $33 instead of over $42, the highest value for which these Rights were once traded (the Rights opened at $40 at time of issuance) (paragraphs 45 through 54).

*Count Two:* alleged, originally against all defendants except First Boston, violations of Sections 5 and 12(1) of the Securities Act of 1933, 15 U.S.C. §§ 77e and 77*l*, and conspiracy, and aiding and abetting thereof. Defendant Union Carbide and its directors failed to register these Rights, allegedly in violation of Section 5 of the 1933 Act. For the purposes of constituting "securities" within the meaning of the Act, plaintiffs here contend that Union Carbide "sold" the Rights to the people who originally received them, in that the Rights were issued for consideration, including the inducement of Union Carbide shareholders to act or refrain from acting so as to discourage GAF from continuing its takeover effort. This count had charged defendant Morgan Stanley and the officer defendants with aiding and abetting and/or conspiring in usurping the proceeds which should go

to the Rights holders (paragraphs 55 through 60). Plaintiffs have withdrawn Count Two except with regard to Union Carbide and its directors (Plaintiff Mem. at 111, n. *).

*Count Three:* pleaded, originally against all defendants except First Boston, violations of Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*. The Complaint charged defendants Union Carbide, Morgan Stanley, and the director and officer defendants with use of instrumentalities of interstate commerce including the mails for prospectuses and oral statements set forth in publicly disseminated documents which were materially misleading, and alleged a conspiracy in that these defendants knew or should have known of such material omissions and misrepresentations (paragraphs 61 through 66). Plaintiffs have withdrawn this count except as against Union Carbide and its directors (Plaintiff Mem. at 111, n. *).

*Count Four:* set forth, against all defendants, claims for breach of contract, conspiracy, and aiding and abetting. Plaintiffs contend that the Rights issued by Union Carbide constituted contracts pursuant to which, among other things, Union Carbide was obligated to seek to effect the sale of the Consumer Products businesses in a manner aimed at achieving maximum value for the holders of the Rights. Union Carbide allegedly breached this contract, resulting in a substantial reduction in the sales proceeds and damage to plaintiff Rights holders, and violated the implied covenant of good faith and fair dealing. The Complaint also alleged that defendants Morgan Stanley, First Boston, and the director and officer defendants knew that the above activities were inconsistent with Union Carbide's contractual obligation to the Rights holders, and "encouraged, conspired in and/or aided and abetted the breach of contract by Union Carbide in that they participated in and approved the execution of the sales agreements . . .", but this secondary conspiracy/aiding and abetting portion of the fourth claim has been withdrawn (paragraphs 67 through 71) (Plaintiff Mem. at 129, n. *).

*Count Five:* stated, against all defendants, a breach of fiduciary duty, conspiracy, and aiding and abetting. Union Carbide and the "director and officer defendants", it is urged, had a fiduciary duty to the shareholders who would and did receive the Rights initially, and to the Rights holders generally, to act in a manner that would be fair and loyal to those persons. In addition, Morgan Stanley had fiduciary duties to the Rights holders, as agent for and advisor to the Union Carbide Board in connection with the Rights and sales of the Consumer Products businesses. These defendants allegedly breached this duty by approving and participating in a tainted negotiating process which was not designed to serve the interests of the class members; by retaining the proceeds and using a portion to pay off large obligations of Union Carbide from the takeover fight; by making misrepresentations; by proposing to include dividend equivalents within the Rights distribution; by burdening the Consumer Products businesses with restrictive employment and supply contracts; and by deducting certain taxes and expenses from the sales proceeds prior to distribution. Plaintiffs further charge Morgan Stanley and First Boston with conspiring and/or aiding and abetting such breaches of fiduciary duty through their participation (paragraphs 72 through 79).

*Count Six:* alleged, against all defendants fraud and deceit. The defendants conspired in making materially misleading statements, and in reliance on these statements and in ignorance of the truth, plaintiffs were induced to purchase or hold the Rights; plaintiffs would not have done so had they known the truth (paragraphs 80 through 83).

*Count Seven:* charged, against all defendants except First Boston, that the alleged materially misleading statements were, at the least, negligent misrepresentations. Plaintiffs were injured in that they purchased Rights at artificially inflated prices and/or were induced to hold the Rights to their injury (paragraphs 84 through 86).

*Count Eight:* alleged, against all defendants except Union Carbide and the "director defendants", intentional interference with contractual relations and business advantage in that these defendants interfered with the contract between Union Carbide and the Rights holders, "by participating in and/or approving the secret negotiations for the sale of the Home and Automotive Products division, which negotiations resulted in an inadequate sales price for that division, and by receiving benefits from that sale" (paragraphs 87 through 89).

The Complaint seeks compensatory damages, and punitive damages for Counts Five, Six and Eight; an order declaring this to be a proper class action; an award of reasonable attorneys' fees; costs, including but not limited to reasonable experts' fees; such other and further relief as the Court may deem necessary and appropriate.

In this Memorandum and Order, the Court makes determinations and disposition only with respect to the motions of defendants Dudley and Egler. For the reasons discussed below, the motion of Dudley and Egler pursuant to Rule 56 is granted, and the case is dismissed as to them.

As correctly noted by these defendants, Mr. Dudley is specifically referred to by name in connection with only one of these allegations: that various secret meetings between him and representatives of First Boston tainted the bidding process (Complaint para. 42(h)). In addition, he is simply identified in his capacity as Vice President of the Home and Automotive division (Complaint para. 15). Mr. Egler is not referred to by name anywhere in the Complaint, other than where he is identified in para. 15 as the President of the Home and Automotive division, and not claimed to have taken any specific action in furtherance of any "scheme" alleged in the Complaint. The Court attaches no significance to this peculiarity of the pleadings because it is sufficiently clear from the Complaint which counts are charged to involve Dudley and Egler, as a result of the global reference to them throughout the Complaint as the "officer defendants." This is so notwithstanding the outrage expressed by these defendants in response to the use of this vague nomenclature (*see* Defendant Dudley and Egler Mem. at 8, n. *). Furthermore, defendants demonstrate their notice and understanding of the claims intended to be pleaded against them, by their detailed presentation to this Court, and by their thorough pursuit of the arguments for dismissal of each of the claims alleged.

The Complaint specifically charges that Dudley and Egler: (1) assisted Union Carbide, the Union Carbide Board of Directors, and Morgan Stanley in conspiring to defeat the GAF takeover by allegedly advancing their own economic interest at the expense of plaintiff Rights holders (para. 44); (2) participated in preparing, reviewing, approving and issuing various materially misleading documents (para. 47, 51); and (3) "knowingly or recklessly disregarded the fact that certain public statements of Union Carbide were materially misleading" (para. 49, 50); and (4) that their participation in the sale in face of this knowledge constituted conspiring in and/or aiding and abetting all of Union Carbide's allegedly deceptive acts, in violation of section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5 (para. 50), sections 5, 12(1) and 12(2) of the Securities Act of 1933, 15 U.S.C. §§ 77e and 77*l* (para. 60, 63, 64) and various common law duties, including breach of contract,[5] breach of fiduciary duty, fraud and deceit, and intentional interference with contractual relations (para. 71, 73, 81, 85, 88, respectively).

Defendants Alfred E. Dudley and Alan C. Egler move first to dismiss the Complaint pursuant to Rules 12(b)(2), 12(b)(6) and 9(b) of the F.R.Civ.P.; or, in the alternative, for summary judgment pursuant to Rule 56, F.R.Civ.P., for the reasons set forth in the motions and supporting memoranda submitted by Defendants Union Carbide and First Boston. In support of dismissal of the federal securities claims, de-

---

**5.** The claim for conspiring in and aiding and abetting breach of contract has been withdrawn by the plaintiffs, "in order to simplify the issues" (Plaintiffs' Mem. at 129, n. *).

fendants Dudley and Egler present four primary grounds: (1) that plaintiffs' First, Third and Sixth Counts are not pled with the particularity required by Rule 9(b); (2) that the Complaint fails to allege a basis for imposing liability upon Dudley and Egler under section 10(b) of the 1934 Act for statements allegedly made by their employer Union Carbide because they were not officers of Union Carbide but only of a division thereof, and as such had no control or authority over the actions of their superiors; (3) that none of the allegations support a claim for fraud or liability under section 12 of the 1933 Act because these individual defendants were neither sellers of securities nor participants with a substantial role therein; and (4) that there is no foundation for the claim for breach of fiduciary duty to Union Carbide due to the knowledge of and ratification by their superior corporate officers; and even if this constituted a breach, such breach would not give rise to a federal securities claim but, rather, a shareholder derivative suit under state law.

Lastly, these defendants contend that, absent the federal securities claims and the jurisdiction thereunder (§ 27 of the 1934 Act, § 22 of the 1933 Act), this Court cannot sustain personal jurisdiction under New York, CPLR § 302, with respect to the Fourth, Fifth, Sixth, Seventh and Eighth Counts alleging violations of state law, and thus the Complaint against Dudley and Egler must be dismissed in its entirety.

*Rule 9(b) Particularity*

▮ Rule 9(b) of the F.R.Civ.P. provides:

> "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally."

Allegations which fail to specify the time, place, speaker, and sometimes even the content of the alleged misrepresentations, lack the "particulars" required by Rule 9(b). *See, e.g., Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986); *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir.1978); *Segal v. Gor-*

*don*, 467 F.2d 602, 608 (2d Cir.1972). The complaint for securities fraud must identify the misrepresentations which were allegedly made, the manner in which they are considered false, and it must set forth facts from which an inference of fraud by a given defendant may be drawn. *See, e.g., Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F.Supp. 518, 522 (S.D.N.Y.1977).

▮ The allegations of fraud cannot ordinarily be based "upon information and belief", except as to "matters peculiarly within the opposing party's knowledge." *See Luce* at 54, n. 1; *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d 374, 379 (2d Cir. 1974), *cert. denied*, 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). If peculiarly within defendants' knowledge, the particularity requirement may be satisfied if these allegations are accompanied by a statement of the facts upon which the belief is founded. *Schlick*, 507 F.2d at 379; *Segal v. Gordon*, 467 F.2d at 608.

However, Rule 9(b) must be read together with Rule 8(a), F.R.Civ.P., which calls for "short and plain statement(s)" of claims for relief. *Divittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242 (2d Cir.1987); 5 C. Wright & A. Miller, Federal Practice & Procedure § 1298 (1969). One is not required to plead evidence. *Schlick v. Penn-Dixie Cement Corp.*, 507 F.2d at 379 (complaint sufficiently alleged, *inter alia*, that defendants caused the Continental pension fund to purchase common stock of Penn-Dixie, which higher price was utilized to obtain an exchange ratio more favorable to Penn-Dixie).

We must bear in mind that the primary function of Rule 9(b) in these cases is to protect accountants and other professionals, as are not involved herein, from a barrage of baseless complaints alleging fraud which have serious potential to injure personal and professional reputations. *Rich v. Touche Ross & Co.*, 68 F.R.D. 243 (S.D.N.Y.1975). *See also Decker v. Massey-Ferguson, Ltd.*, 681 F.2d 111, 114 (2d Cir.1982); *Felton v. Walston and Co.*, 508 F.2d 577, 581 (2d Cir.1974); *Segal v. Gordon*, 467 F.2d at 607; 5 C. Wright & A. Miller, Federal Practice & Procedure

§ 1296 (1969). Rule 9(b) is, after all, said to have been designed to further three goals: providing a defendant fair notice of the plaintiff's claim, to enable preparation of a defense; protecting a defendant from harm to his reputation or goodwill as a result of loose charges of fraud and deceit; and reducing the number of strike suits. *Divittorio v. Equidyne Extractive Industries, Inc.*, 822 F.2d 1242 (2d Cir.1987). The high cost of maintaining contingent fee litigation has largely eliminated this latter perceived peril.

In *Ross v. A.H. Robins Co., Inc.*, 607 F.2d 545, 557–8 (2d Cir.1979), *cert. denied,* 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980), our Court of Appeals reviewed the cases in this area and concluded that: "a plaintiff alleging fraud in connection with a securities transaction must specifically allege the acts or omissions upon which his claim rests. It will not do merely to track meaningless phrases as 'scheme and conspiracy' or 'plan and scheme and course of conduct to deceive.' A defendant is entitled to a reasonable opportunity to answer the complaint and must be given adequate information to frame a response." That court therein concluded on facts similar to those at bar, that plaintiffs had identified adequately the alleged misrepresentations by reference to the specific documents (prospectus, annual reports and press releases).

In the instant case, plaintiffs do not base their allegations "upon information and belief." The most detailed statement of facts in the Complaint as to defendants Dudley and Egler is set forth in paragraph 42(h), which alleges in part that:

"Contrary to the representations in the above described documents, the actual process and negotiation of the sale of the Home and Automotive division, and the ultimate terms of sale, were not designed to maximize the sales proceeds. Rather, the competitive bidding process was fundamentally tainted in a number of respects which enabled the First Boston leveraged buyout group to purchase the Home and Automotive division at an unfairly low price. The competitive bidding process was tainted in respects which included the following:

(i) Union Carbide and the officer defendants (including without limitation defendant Dudley) met secretly with representatives of First Boston (including without limitation Arthur Nagle, Denis Newman, and Daniel O'Connell) separate and apart from, and in contravention of, the bidding process which theoretically applied to all bidders. Such meetings were initiated as early as January 4, 1986, before the offering materials announcing a sale of the Home and Automotive division had been circulated to prospective purchasers, and continued until the sale to First Boston was announced. As a result of these meetings, and in contravention of the bidding process which supposedly applied to all bidders, the First Boston group obtained a special advantage over other bidders in evaluating the Home and Automotive division, in determining the amount of their bid, and in negotiating a resolution of certain issues involving raw material supply contracts which Union Carbide had insisted be a part of the purchase transaction. Among other things, First Boston received assistance and insight from defendant Dudley which enabled it to propose a revised raw materials contract which, if stated, would increase the value of the Home and Automotive division to First Boston by approximately $80 million. The First Boston group also had knowledge of the identities of competing prospective purchasers and of the range of their bids. No other competing purchaser possessed such knowledge or advantages. Such knowledge enabled First Boston to adjust its bid according to the bids of its competitors and was a factor which reduced the ultimate sales price.

(ii) The aforementioned officer defendants and Home and Automotive division management employees had a personal stake in the success of the First Boston bid, because (a) First Boston had indicated a greater likelihood that it would keep on existing management than other bidders, and (b) First Boston's proposal included equity ownership by manage-

ment of the Home and Automotive division on a basis grossly disproportionate to the amount of capital those employees would be supplying toward the equity component of the purchase price. It was also understood that defendant Dudley would be the chairman of the board and president of the First Boston subsidiary purchasing the Home and Automotive division. As a result of their personal interest in the First Boston offer, Home and Automotive management who met with prospective purchasers in briefing sessions had a motive to, and did, fail to provide the same encouragement and assistance to competing purchasers that they provided to First Boston...."

Further claims against these defendants are sufficiently contained in paragraphs 20, 44, 49, 50, and 51, the allegations of which have been summarized, *supra*.

■■■ The Complaint adequately specifies the statements it claims were false or misleading, and the manner in which plaintiffs assert this to be so. The Complaint identifies the documents and announcements to the public in which these statements, and omissions, were contained; the meetings in which these individual defendants took the actions complained of; and the defendants charged, either directly or as conspirators or aiders and abettors, with those underlying actions or omissions. Despite the protestations of the defendants, this Court concludes that these allegations of fraud, treated in context, are not entirely conclusory or unsupported by assertions of fact; such statements do "allege with some specificity the acts constituting the fraud," *Rodman v. Grant Foundation*, 608 F.2d 64, 73 (2d Cir.1979). Plaintiffs have stated "the content of and circumstances surrounding the allegedly fraudulent statements and material omissions and who made or failed to make which statements", as in *Mauriber v. Shearson/American Express, Inc.*, 567 F.Supp. 1231, 1235–36 (S.D.N.Y.1983) (Duffy, J.). Thus, the Complaint states with the requisite specificity the acts constituting the alleged fraud and avoids undue reliance on "conclusory allegations that defendant's conduct was fraudulent." *Decker v. Mas-*

sey-Ferguson, Ltd.*, 681 F.2d at 114; *Rich v. Touche Ross & Co.*, 415 F.Supp. 95 (S.D.N.Y.1976). As for the additional elements of knowledge and scienter, Rule 9(b) requires only that such allegations be asserted in the most general fashion. *See Goldman v. Belden*, 754 F.2d 1059, 1070 (2d Cir.1985).

Moreover, complaints dismissed under Rule 9(b) are "almost always" dismissed with leave to amend. 2A J. Moore & J. Lucas, *Moore's Federal Practice*, para. 9.03 at 9–34 (2d ed. 1986); *Luce*, 802 F.2d at 56; *Yoder v. Orthomolecular Nutrition Institute, Inc.*, 751 F.2d 555, 562 (2d Cir. 1985). Therefore, even if we were to find the allegations in the Complaint to be insufficiently pleaded on their face, we would be compelled to grant plaintiffs' request herein to replead. No meaningful purpose would be served by this exercise, because, as is apparent from the deposition testimony and documents submitted to the Court in connection with these motions, the movants have been given quite adequate notice of the specific allegations the plaintiffs assert against them, *see Ross*, 607 F.2d at 557; *Denny v. Barber*, 576 F.2d at 469; *Goldman v. Belden*, 754 F.2d at 1070.

Accordingly, the Court concludes that the Complaint as a whole alleges facts in sufficient detail to withstand the motion to dismiss on Rule 9(b) grounds.

*Liability Under Section 10(b) of the 1934 Act*

Defendants Dudley and Egler have moved for summary judgment pursuant to Rule 56, F.R.Civ.P., in connection with plaintiffs' allegation that Dudley and Egler are subject to liability under Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5, as promulgated thereunder, by "singly or in concert, and aiding and abetting one another, engag[ing] in an unlawful combination and conspiracy ... to defraud; ... [making] untrue statements of material fact and omitt[ing] to state other material facts necessary in order to make the statements made not misleading...." (Complaint para. 46). Furthermore, the plaintiffs allege that Dudley and Egler partici-

pated in "preparing, reviewing, approving and issuing various materially misleading documents...." (Complaint para. 47).

The issue before this Court is whether the plaintiffs have presented facts which form a basis for their allegations that the defendants, Dudley and Egler, have committed a primary or secondary violation of Rule 10b–5, as promulgated under Section 10(b) of the Securities Exchange Act of 1934, thus warranting denial of the defendants' motion for summary judgment. For the reasons which follow, this Court concludes that the plaintiffs have failed to support their allegations of violations of Rule 10b–5 by these defendants.

First, the Court finds no factual basis presented for the plaintiffs' broad, conclusory allegations that the defendant Dudley, former Vice President-Operations of Union Carbide's Home and Automotive division, or the defendant Egler, former President of the H & A division (Complaint para. 15), engaged in any scheme to defraud, made any misleading statements, or engaged in frauds or deceits with respect to the issuance or sale of the Rights (Complaint paras. 42(a)–(g), 46). Furthermore, the facts alleged do not support the plaintiffs' more specific allegations that these defendants participated in the preparation, dissemination, or issuance of materially misleading documents allegedly issued by Union Carbide (Complaint paras. 42(a)–(g), 47). The facts alleged with respect to Dudley's and Egler's conduct during the relevant period refer only to a series of meetings between Dudley and representatives of First Boston which began in January of 1986, during which Dudley discussed the prospective sale of the H & A division to First Boston (Complaint para. 42(h)(i)). Plaintiffs further allege and the Court assumes that the understanding of the parties to these meetings was that if First Boston were the successful bidder in the "competitive bidding process" under which the H & A division was to have been sold (Complaint paras. 42(h)(i)–(ii)), there would be a "greater likelihood" that: (1) Dudley and Egler would be retained in their jobs along with the rest of the H & A division

management; (2) Dudley and Egler and the rest of the H & A division management would acquire equity ownership of the H & A division on a favorable basis; and (3) Dudley would become chairman of the board and president of First Brands Corporation, the First Boston subsidiary purchasing the H & A division (Complaint para. 42(h)(ii)).

Assuming, for purposes of this analysis only, that the documents issued by Union Carbide contained misstatements of material fact or omitted any material facts with respect to these meetings, there is no support for the allegation that Dudley's and Egler's activities extended beyond the meetings with First Boston, so as to include participation in the preparation, dissemination, or issuance of the shareholder documents, even if those documents misrepresented, or omitted mention of, the meetings themselves. Furthermore, this Court finds no sensible basis for any inference that Dudley and Egler, whose responsibilities were in the area of the manufacture and distribution of products, would have any responsibility for the preparation of documents or public statements by Union Carbide relating to issuance of the Rights. Finding no allegation of participation or direct involvement by Dudley or Egler in the drafting, editing or issuance of the relevant documents, this Court concludes that the facts alleged are insufficient to support an allegation of a primary violation of Rule 10b–5 by either Dudley or Egler.

This Court now examines whether the facts alleged support the plaintiffs' allegations that Dudley and Egler are liable for a secondary violation of Rule 10b–5 by either aiding and abetting a primary violation or conspiring to commit a securities law violation. To support an allegation that a defendant is liable for aiding and abetting a securities law violation requires three elements:

"(1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party,

(2) 'knowledge' of this violation on the part of the aider and abettor; and

(3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation."

*Bloor v. Carro, Spanbock, Londin, Rodman & Fass,* 754 F.2d 57, 62 (2d Cir.1985); *IIT, An International Investment Trust v. Cornfeld,* 619 F.2d 909, 922 (2d Cir.1980).

For purposes of this analysis only, the Court assumes that the plaintiffs have supported adequately their claim of a primary violation of a securities law by Union Carbide, thus satisfying the first element of aider and abettor liability. Therefore, it remains for this Court to determine whether the plaintiffs have alleged facts sufficient to support a finding that: (1) Dudley and/or Egler had "knowledge" of a scheme to defraud, engagement in frauds or deceits, or preparation and issuance by Union Carbide of documents containing misleading statements or omissions of material fact; and (2) either or both of these defendants rendered "substantial assistance" to Union Carbide in its primary violation of Rule 10b–5. If either of these requisites is not satisfied, the plaintiffs' claims of aider and abettor liability against Dudley and Egler must fail.

▪ The applicable scienter standard depends on the facts. If the aiding and abetting of the primary violation is in the form of an affirmative act, the scienter requirement is satisfied by either a conscious intent to aid and to abet a primary violation or by reckless disregard of the effect of the assistance being rendered to the primary violation. *See IIT, An International Investment Trust,* 619 F.2d at 923; *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1300–02 (2d Cir.1973) (en banc). As this Court has already noted in its discussion of the allegations of primary violations by these defendants, *supra,* the facts alleged do not indicate that Dudley or Egler engaged in any affirmative act in furtherance of a Rule 10b–5 violation, and do not provide a logical basis for an inference that any such affirmative act by Dudley or Egler took place. Therefore, if Dudley and/or Egler did aid and abet a securities law violation, the aiding and abetting

would have to have been in the form of a failure to act.

▪ The first consideration in arriving at the appropriate scienter standard in cases where aiding and abetting due to inaction is alleged, is to determine whether a defendant owes a duty to plaintiff to disclose knowledge of the primary violation. If no such duty exists, then reckless disregard of the primary violation is not sufficient to satisfy the scienter requirement. *See Quintel Corp., N.V. v. Citibank, N.A.,* 589 F.Supp. 1235, 1244 (S.D.N.Y.1984); *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983); *IIT, An International Investment Trust,* 619 F.2d at 923. While some courts have stated that reckless disregard of a primary violation meets the scienter requirement in those cases in which the defendant has no duty to disclose and can reasonably foresee reliance by a plaintiff or plaintiffs upon false or misleading information, see, *e.g., Quintel Corp., N.V.,* 589 F.Supp. at 1244; *Competitive Assocs., Inc. v. Laventhol Krekstein Horwath & Horwath,* 478 F.Supp. 1328, 1341 (S.D.N.Y.1979), our Circuit has not yet accepted this proposition. *See Quintel Corp., N.V.,* 589 F.Supp. at 1244; *Oleck v. Fisher,* 623 F.2d 791, 795 (2d Cir.1980). As the plaintiffs do not allege or argue that the Rights holders reliance on misstatements or omissions in the Union Carbide documents or other fraudulent activity in which the other defendants allegedly engaged was reasonably foreseeable by Dudley and/or Egler, this Court will not address this issue.

▪ Here, the plaintiffs' only allegations with respect to Dudley's and Egler's knowledge are that they knew of or recklessly disregarded the materially misleading nature of the Union Carbide documents (Complaint paras. 48–50). Furthermore, the plaintiffs appear to allege that Dudley and Egler had a continuing duty to issue a corrective public statement with respect to an alleged projection of $2.5 billion in pretax proceeds resulting from the sale by Union Carbide of its Consumer Products Businesses (Complaint para. 48). This Court finds no basis in the alleged facts for

the plaintiffs' conclusory allegations of knowledge or reckless disregard of the misleading nature of the documents by Dudley and/or Egler. There is no factual support for the notion that either of these defendants had any knowledge of the contents of these documents or participated in their creation. Indeed, it is difficult for this Court to imagine a corporate structure in which officers such as these whose responsibilities are the manufacture of home and automotive products, are charged also with the task of preparing disclosure documents or public statements disseminated by the corporation to the public investors.

Even assuming, however, that the alleged facts do provide support for the allegations that Dudley and Egler knew of or recklessly disregarded the misleading nature of the documents, these allegations would be insufficient to meet the heightened scienter requirement applied to those situations in which the alleged aiding and abetting of a securities law violation takes the form of a failure to speak or to act. The allegations would be supportable only if the plaintiffs were to allege facts providing a basis for the existence of a duty to disclose. *See Reingold v. Deloitte Haskins & Sells*, 599 F.Supp. 1241, 1270 (S.D. N.Y.1984). While this Court agrees with the defendants' assertion that the facts do not support the allegation that Dudley and Egler owed to the Rights holders a duty to disclose, it does not concur completely with the defendants' reasoning in support of this assertion.

In part, Dudley and Egler base their contention that a duty to disclose does not exist, upon the theory that they were not officers of Union Carbide, but, as officers of its H & A division, were "mid-level management," and as such had no duty to disclose misrepresentations to the shareholders or to the investing public (Dudley and Egler Mem. at 17). This argument is not supported by New York law, which makes no such distinctions among corporate officers either in statutes or in decisions. The authority of all officers of Union Carbide, a New York corporation, is conferred by § 715(g) of the New York Business Corporation Law, which provides:

"(g) All officers as between themselves and the corporation shall have such authority and perform such duties in the management of the corporation as may be provided in the by-laws or, to the extent not so provided, by the board."

New York Business Corporation Law, § 715(g). Although § 715(g) grants each New York business corporation discretion over the scope of actual authority and duties assigned to each officer of a corporation, the same statutory conditions as to actual authority and duties apply to all officers of a given corporation. Any differentiation of such conditions among the officers of a corporation is made by the corporation itself, through its by-laws or its board of directors. *See* New York Business Corporation Law, § 715(g).

New York case law states that a corporate officer's apparent authority, i.e., the authority an officer is permitted by the corporation to represent that he or she possesses, may be relied upon by a third party, provided that the third party has no notice or knowledge of any limitations on that authority. *Goldenberg v. Bartell Broadcasting Corp.*, 47 Misc.2d 105, 262 N.Y.S.2d 274, 282 (N.Y.Co.1965). With respect to third parties, knowledge of statutory conditions upon the authority of a corporate officer is presumed. *Goldenberg*, 262 N.Y.S.2d at 282–83. Third parties who have a greater degree of business experience and sophistication may be presumed to have knowledge of limitations imposed upon the authority of an officer both by statute and by the corporation itself. *See Goldenberg*, 262 N.Y.S.2d at 283. Therefore, to third parties other than those possessing a higher degree of business experience and sophistication, all corporate officers have the same scope of apparent authority and the same duties as other officers of the same corporation. Under the New York Business Corporation Law and New York case law governing the scope of apparent authority of corporate officers, an officer is an officer. *But see contra Rossini v. Ogilvy & Mather, Inc.*, 798 F.2d 590 (2d Cir.1986).

■ Here, the defendants Dudley and Egler seek to avoid liability on the ground that they are not officers of Union Carbide (Dudley and Egler Mem. at 17). This Court finds that Dudley and Egler cannot deny their roles as officers and agents of Union Carbide simply by disclaiming any true power as such. That the defendants' authority to act on behalf of the corporation may be limited in some respects does not alter their status as corporate officers. If this Court were to accept, which it does not, the plaintiffs' implicit assumption that all officers of Union Carbide owe a duty to disclose or to correct known false or misleading statements contained within Union Carbide's securities documents, the defendants' disclaimer of the powers generally associated with their positions as officers of Union Carbide would not relieve them from the duty to disclose.

■ This Court finds more merit in the defendants' second argument that they lacked the authority to disclose or to correct such documents or statements, and rejects the notion, implicit in the plaintiffs' allegations that Dudley and Egler, whose responsibilities to Union Carbide were in the area of manufacture of home and automotive products, had a corporate duty, *ex officio,* to disclose or to correct any misleading statements contained in Union Carbide documents prepared for the corporation by others, or to disclose or to correct any misrepresentations or omissions with respect to the purchase or sale of Union Carbide securities made by others, although they may have had apparent or statutory authority to do so, if so advised.

Our Circuit has held that, in the absence of direct participation in a securities violation, an outside director of a corporation has no duty to disclose adverse material facts or information to those prospective purchasers. *Lanza v. Drexel & Co.,* 479 F.2d 1277, 1289 (2d Cir.1973) (en banc); *Decker v. Massey-Ferguson, Ltd.,* 681 F.2d 111, 119 (2d Cir.1982). *Cf. Divittorio v. Equidyne Extractive Industries, Inc.,* 822 F.2d 1242 (2d Cir.1987) (officers and directors of the general partner of a limited partnership were held not liable for misrepresentations allegedly made in an Offering Memorandum issued by the partnership, which the defendant officers played no part in preparing); *IIT, An International Investment Trust,* 619 F.2d at 927 (outside accountant was held to have no duty to correct an allegedly false and misleading prospectus issued by the corporate defendants). Dudley's and Egler's positions with respect to the preparation and dissemination of the Union Carbide documents are analogous to those of the individual defendants in our Circuit's cases just mentioned. As noted in our discussion of the allegations of primary violations of Rule 10b–5, *supra,* there is no factual basis alleged to support a finding that either Dudley or Egler directly participated in the preparation or issuance of the allegedly tainted documents or in any other alleged violation of Rule 10b–5. For either of the defendants to have done so would have been outside the scope of the duties imposed upon them by their corporate employer, Union Carbide. In the absence of direct participation in preparation or issuance of the documents, and in the absence of any actual authority to do so, Dudley and Egler had no duty to disclose or to correct any misstatements or omissions of material fact by others contained within the Union Carbide documents or elsewhere.

Our Circuit has adopted, in *IIT, An International Investment Trust,* 619 F.2d at 926–27, the principle that in the absence of a duty to disclose, the scienter requirement is elevated to that of a "high conscious intent" to aid and abet a securities law violation. *Id.; Brennan v. Midwestern United Life Insurance Co.,* 417 F.2d 147, 154 (7th Cir.1969); *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.,* 602 F.2d 478, 484–85 (2d Cir.1979); *Woodward v. Metro Bank of Dallas,* 522 F.2d 84, 97 (5th Cir.1975); *Quintel Corp., N.V.,* 589 F.Supp. at 1244.

■ Here, the plaintiffs fail to show facts to support an inference that either

Dudley or Egler possessed a high conscious intent to aid and to abet the perpetration of a securities law violation.

Nor does this Court find merit in the argument advanced in the plaintiffs' briefs that the potential for financial gain by an alleged aider and abettor is indicative of high conscious intent to aid and to abet a securities law violation. (*Cf.* Plaintiff Mem. at 95–97).

 Furthermore, the facts alleged do not support a finding that Dudley and Egler have rendered substantial assistance to a primary violation of the securities laws. Substantial assistance is rendered when a defendant's action or inaction constitutes a substantial causal factor in the perpetration of a primary securities violation. See *Rolf v. Blyth, Eastman, Dillon & Co.,* 570 F.2d 38, 48 (2d Cir.1978); *Bloor,* 754 F.2d at 62; *Armstrong,* 699 F.2d at 92; *Edwards & Hanly,* 602 F.2d at 484. The causation necessary to satisfy the substantial assistance requirement must exceed traditional "but-for" causation. For example, in *Armstrong,* 699 F.2d at 92, our Circuit rejected a claim that an investment advisor's awareness and approval of the churning of funds was a "but-for" cause of the primary defendant's churning, because the churning could have taken place upon the advice of others or without any outside advice. The *Armstrong* court found that, because the investment advisor's approval, which did not even satisfy a "but-for" concept of causation, it did not constitute "substantial assistance," and, therefore, the investment advisor was not liable as an aider and abettor. *Id.; accord, Edwards & Hanly,* 602 F.2d at 484.

Our Circuit has also set forth the principle that to establish causation with respect to a 10b–5 violation, a plaintiff must show " 'both *loss causation* —that the misrepresentation or omissions caused the economic harm—and *transaction causation* —that the violations in question caused the [plaintiff] to engage in the transaction in question.' " *Bennett v. United States Trust Co.,* 770 F.2d 308, 313 (2d Cir.1985), *cert. denied,* 474 U.S. 1058, 106 S.Ct. 800, 88 L.Ed.2d 776 (1986), *quoting Schlick v. Penn-Dixie Cement Corp.,* 507 F.2d 374, 380 (2d Cir.1974), *cert. denied,* 421 U.S. 976, 95 S.Ct. 1976, 44 L.Ed.2d 467 (1975). The concepts of loss causation and transaction causation in the 10b–5 context are illustrated in *Rich v. Touche Ross & Co.,* 415 F.Supp. at 97–98. In *Rich,* a complaint alleged that the plaintiffs, trustees of a stock brokerage firm, made four purchases of securities in reliance on allegedly misleading statements contained in financial statements certified for the brokerage firm by the defendant, which was its independent certified public accountant. This Court held that the complaint did not, nor could it, claim that the misrepresentations or omissions allegedly contained within these statements caused the plaintiffs to enter into the purchase transactions in question or caused the loss in question, as other possible factors could account for either event. *Rich,* 415 F.Supp. at 98. In addition, it has been held that in order for substantial assistance to be rendered with respect to a misstatement contained in a document for purposes of determining aider and abettor liability, the assistance must relate to the preparation or dissemination of the document itself. *Terrydale Liquidating Trust v. Gramlich,* 549 F.Supp. 529, 531 (S.D.N.Y.1982).

 In this case, there is no basis for an inference that the allegedly misleading statements or documents would not have been issued "but for" Dudley's or Egler's approval or failure to issue a correction.

This Court concludes that the plaintiffs have not alleged facts sufficient to support their claims that Dudley and Egler are secondarily liable as aiders and abettors of a violation of Rule 10b–5.

 In addition, the plaintiffs allege that Dudley and Egler "engaged in an unlawful combination and conspiracy" to violate Rule 10b–5 (Complaint para. 47) and that their participation in the sales of the Consumer Products Businesses constituted, *inter alia,* "a conspiracy in ... the deceptive acts alleged in this cause of action" (Complaint para. 50). In addition to the existence of a primary violation, liability for conspiracy requires "knowledge [of the

primary violation] plus an agreement with the [primary violator]." *Troyer v. Karcagi,* 476 F.Supp. 1142, 1153 (1979), *quoting* Ruder, "Multiple Defendants in Security Law Fraud Cases: Aiding and Abetting, Conspiracy, *In Pari Delicto,* Indemnification and Contribution," 120 *U.Pa.L.Rev.* 597, 630 (April 1972). Plaintiffs do not specifically allege that Dudley and Egler made an agreement with a primary violator of Rule 10b–5, nor do they present facts which would justify an inference of such an agreement. *See Troyer v. Karcagi,* 476 F.Supp. 1142, 1153 (S.D.N.Y.1979); *Bresson v. Thomson McKinnon Securities, Inc.,* [Current Binder] Fed.Sec.L.Rep. (CCH), para. 92,855 at 94, 158 (S.D.N.Y. July 22, 1986).

Therefore, this Court concludes that the plaintiffs have failed to provide a basis sufficient to support their broad conclusory allegations that Dudley and Egler were part of any conspiracy to violate Rule 10b–5.

Because the plaintiffs have failed to substantiate their allegations of primary and secondary violations by the defendants Dudley and Egler of Rule 10b–5, as promulgated under Section 10(b) of the 1934 Act, these defendants' motion for summary judgment with respect to these claims made against them are granted.

*Claims under Sections 5, 12(1) and 12(2) of the 1933 Act*

Apparently plaintiffs have withdrawn Counts Two and Three, which allege violations of sections 5, 12(1), and 12(2) of the Securities Act of 1933, as to Dudley and Egler in addition to Morgan Stanley. The Court refers to a statement relegated to a footnote in plaintiffs' responsive papers: "In an effort to streamline the case, plaintiffs are willing to withdraw their claims against defendants other than Carbide and its directors under the Securities Act of 1933" (Plaintiff Mem. at 111, n. *). Presumably by this statement plaintiffs intend to exclude Dudley and Egler from these claims, as these two individuals are generally referenced throughout the Complaint as the "officer defendants" and not treated together with the Union Carbide "director

defendants." Plaintiffs certainly have not offered any support of these claims in response to the cogent arguments made by defendants Dudley and Egler with respect thereto, and the Court deems such claims to be abandoned if not withdrawn by the plaintiffs. However, the parties proceeded at oral argument to continue to address these issues (Conference of April 28, 1987, Tr. at 75). The Court will briefly touch upon the 1933 Act claims, in the unlikely event that it misconstrues the plain meaning of plaintiffs' footnote.

The entirety of plaintiffs' allegations in connection with their claim against these defendants for liability under section 12(1) on the basis of Union Carbide's alleged violation of section 5 of the 1933 Act is stated in the Complaint as follows:

"Morgan Stanley and the officer defendants have aided and abetted and/or conspired in Union Carbide's wrongful effort to usurp for itself proceeds which should go to the Rights holders, through offering and selling securities in violation of Section 5." Complaint para. 60.

Even if Union Carbide's failure to file a registration statement violated § 5 of the 1933 Act, an issue which this Court does not now reach, plaintiffs have not stated a claim against Dudley and Egler for conspiring in support of and/or aiding and abetting such a violation. Plaintiffs fail to allege that either Dudley or Egler was involved in selling or issuing a single Right to a putative class member, or that either was involved in any way with Union Carbide's decision not to file a registration statement.

This Circuit requires some allegation that a defendant was a participant in the sale of a security to the plaintiff, or was a party to a solicitation to purchase. In the leading case in this area, *Katz v. Amos Treat & Co.,* 411 F.2d 1046 (2d Cir.1969), our Court of Appeals concluded that two officers of the defendant stock brokerage firm, one who had neither known of nor participated in the sale and the other who had merely signed the stock certificates, could not be held liable under section 12(1) for the sale of unregistered securities by

the firm because that section was not "intended to embrace a corporate officer or director merely because he has knowledge of a sale of unregistered stock and plays such a minor role in facilitating it." *Id.* at 1053. *See also Klein v. Computer Devices, Inc.*, 591 F.Supp. 270, 275 (S.D.N.Y. 1984), *clarified*, 602 F.Supp. 837 (S.D.N.Y. 1985); *Katz v. David W. Katz & Co.*, [1984 Transfer Binder] Fed.Sec.L.Rep. (CCH) para. 99,669 at 97, 687 (S.D.N.Y. February 14, 1984) ("plaintiff, at minimum, must show some meaningful participation in an 'offer or sale' on the part of those charged with Section 12 liability").

Here, aside from a mere conclusory allegation in para. 47 of the Complaint, plaintiffs have not contended, in oral argument or motion papers, nor do they present any evidence of even the most minimal role of defendants Dudley and Egler in facilitating the sale or issuance of the Rights to individuals, as distinct from participation in the sale of the Home and Automotive business to First Boston.

In the Third Count, plaintiffs allege in connection with their claim under § 12(2) of the 1933 Act, that:

> "Union Carbide, Morgan Stanley, the director defendants and the officer defendants were substantial, necessary participants and factors in the sale of the Rights to Union Carbide shareholders and the investing public, and they conspired and aided and abetted one another in connection with the preparation and/or dissemination of the materially misleading prospectuses and statements used in conjunction with the sale of the Rights." Complaint para. 63.

Here again the pleading fails to satisfy the requisite elements for liability.

■ Section 12(2) requires that plaintiffs establish privity or scienter on the part of the individual defendant. *Lanza v. Drexel & Co.*, 479 F.2d 1277, 1298 (2d Cir. 1973). "Officers and directors may be directly liable under section 12(2) as 'participants' in the sale, but such liability depends upon proof of the facts in each case and for each person, not merely upon a certain status" *Id.* at 1299 (citation omitted). To satisfy the privity requirement, a plaintiff must demonstrate the defendant to have been a substantial participant with a significant role in the sale of the securities to the plaintiff. *Devaney v. Chester*, [Current Binder] Fed.Sec.L.Rep. (CCH) para. 92,747 (S.D.N.Y. April 29, 1986) (defendants' actions must have furthered plaintiff's investment decision); *Akerman v. Oryx Communications, Inc.*, 609 F.Supp. 363, 374 (S.D.N.Y.1984), *aff'd* 810 F.2d 336 (2d Cir. 1987). *Cf. Katz v. Amos Treat & Co.*, 411 F.2d 1046 (2d Cir.1969).

■ Plaintiffs fail to allege facts from which an inference of privity or scienter may be drawn. They set forth in sufficient detail the meetings between First Boston and Dudley, with at least the knowledge if not the presence of Egler. These meetings were allegedly motivated, among other things, by self-interest in preserving their jobs. Nowhere does the specific contention emerge that these individuals personally assisted in the issuance of the Rights to shareholders, or solicited for the sale of these Rights on the secondary market.

For the foregoing reasons, both the Second and Third Counts against Dudley and Egler for violations of §§ 12(1) and 12(2) of the 1933 Act are dismissed.

### Breach of Fiduciary Duty Claim

■ Defendants Dudley and Egler urge that so much of the Complaint charging breach of fiduciary duty to Union Carbide, should be dismissed, on the ground that Dudley and Egler reported their meetings with the First Boston representatives to their superiors at Carbide and received implicit, if not express, approval for their actions.

At most, this alleged breach would give rise to a shareholder derivative suit under state law, rather than a federal securities claim.

Such a derivative claim is not before us, and probably will not be since there are obvious inconsistencies between prosecuting a class action against a corporate defendant and at the same time prosecuting a derivative claim in behalf of the corporation. *But* note *Birnbaum v. Newport*

*Steel Corp.,* 193 F.2d 461 (2d Cir.1952), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), decided in 1952 to the contrary (hybrid class-derivative suit). Additionally, Rights holders in this context are not shareholders but rather creditors or beneficiaries of an agreement made with the shareholders of record at the date of declaration of that partial liquidating dividend which the Rights reflect. Apparently many members of the purported class were not Union Carbide shareholders between January 2, 1986 and the signing of the final agreement between Union Carbide and First Boston on April 21, 1986, nor did they obtain title to shares of Union Carbide stock subsequently by operation of law (Dudley and Egler Mem. at 35–36). Such Rights holders, who did not own Union Carbide shares during the purported class period, would appear to lack standing to assert a derivative claim of fiduciary breach against Dudley and Egler or the other defendants.

The Court agrees that Dudley and Egler are entitled to summary judgment in their favor on this aspect of the Complaint, without prejudice to the rights, if any, of the corporation itself, or of any shareholder who has first complied with Rule 23.1, F.R. Civ.P.

Our comments should not be read to suggest a belief on the part of this Court that there exists a valid derivative claim. Indeed, the contrary appears. The Court finds it unlikely that any breach by Dudley and Egler will be found to exist as concerns the fiduciary duty which is concededly owed to the defendant Union Carbide by all corporate officers.

The allegedly "secret" meetings between Dudley and First Boston representatives held on January 4 and 8, 1986, were reported by him to his superior in the Home and Automotive division, Egler, and then to Soisson, a senior officer of Carbide's Acquisitions and Divestiture Department, or a jury could so find (Dudley Tr. at 38, annexed as Exhibit 7 to Plaintiff Mem.; Egler Tr. at 40, Exhibit 8 to Plaintiff Mem.; Soisson Transcript at 5–6, Exhibit 26 to Plaintiff Mem.). There is some evidence that these activities, as well as a later meeting in which both Morgan Stanley and Egler himself participated (Egler Tr. at 50, 51), were undertaken with the approval and ratification of higher level management of Union Carbide and in furtherance of the interests of the corporation. This likelihood does not, however, rise to the level of certainty as a matter of law.

Plaintiffs allege a breach of defendants' fiduciary obligations to the Rights holders by permitting the Home and Automotive division sale to be conducted by means of a "corrupt bidding process" so that the business would be sold to a purchasing group which included members of Union Carbide management. In this regard, defendants contend that, as "subordinate employees", neither Dudley nor Egler had control over Union Carbide and Morgan Stanley, and they were not initially members of a "purchasing group", but were offered the opportunity to invest in equity *after* First Boston entered into a binding agreement with Union Carbide (Dudley and Egler Mem. at 37, n. *). The Court finds these statements, which it does not adopt, not to be dispositive as a matter of law of the allegations of breach of fiduciary obligations.

As concerns the Rights holders, plaintiffs claim a common law duty, fiduciary in nature, existed as to them, either as creditors of the corporation (Plaintiff Mem. at 122) or by virtue of the "disparity of position between the parties" (Plaintiff Mem. at 119). However, this Court concludes that Dudley and Egler owed no fiduciary duty to the Rights holders, as they were not involved in, nor did their duties include, the issuance of these Rights and the accompanying documents, and performance of any obligations which the corporation assumed thereby. The Court does not now address whether Union Carbide, and the director defendants, breached their duty by not insuring a competitive bidding process in the sale of the Home and Automotive division.

These two defendants were Vice President and President of the Home and Automotive division, and subsequently, as a re-

sult of the actions which are the subject of the Complaint, became President and Chief Executive Officer (Dudley), and Consultant and Vice Chairman of the Board (Egler) of the new company, First Brands. At the relevant times, the duties of Dudley and Egler apparently did not include merchandising, as that was conducted by the home office. Dudley and Egler did not themselves have any assigned duty to insure the conduct of a competitive bidding process, or to contact other bidders in addition to First Boston.

■ On their own initiative, outside of the scope of their regular duties, Dudley and Egler apparently contacted First Boston with the intention of obtaining an equity ownership interest and favorable employment in the resulting new venture. In so doing, they acted within their rights as individuals and employees, and not in violation of any fiduciary duty or express provision of the employment contract.

In the absence of fraud or a breach of an express contract or a special fiduciary duty voluntarily accepted, an ordinary employee who has left his employer will not be restrained from competing, nor from soliciting the customers of his former employer. 60 N.Y.Jur.Trademarks § 112, at 184; 52 N.Y.Jur.2d Employment Relations § 214, at 261–2. This rule of law has served throughout history to assure the freedom of the employee from restraint in trade, so that, upon termination of the economic relationship between master and servant, each can go forward and practice the mysteries of their craft so as to continue to earn a livelihood and benefit the national economy by competition.

An employee is entitled to learn the ordinary operation of an ordinary business in the course of his employment, and will not be enjoined from putting such knowledge to subsequent use where there is nothing secret, confidential, or unusual about it. 60 N.Y.Jur.Trademarks § 112, at 185. *See, e.g., Lloyd Employment Corp. v. Kraft*, 95 N.Y.S.2d 313 (1950); *Baldwin v. Von Micheroux*, 5 Misc. 386, 25 N.Y.S. 857 (1893), *aff'd* 31 N.Y.S. 696 (1894). Most recently, in *Advance Biofactures Corp. v. Green-*

*berg*, 103 A.2d 834, 478 N.Y.S.2d 344 (2d Dep't 1984), the New York Appellate Division reaffirmed this established principle that an employee may not be restrained from using the general techniques learned during his employment, emphasizing that the employer's interest in even a trade secret "must be crystal clear to justify the restraint of the employee, for whom it may have become part of his general knowledge and experience." *Id.* at 346. Even in situations where the employee is hired to improve articles manufactured in his place of business, the courts of New York have held him entitled to enjoy the fruits of any improvement which he conceives, *Cahill v. Regan*, 5 N.Y.2d 292, 184 N.Y.S.2d 348, 157 N.E.2d 505 (1959).

Nor do the facts of this case, as alleged, comport with the exception to this general rule, carved by cases such as *Duane Jones Company, Inc. v. Burke*, 306 N.Y. 172, 117 N.E.2d 237 (1954), and *McLean v. Hubbard*, 24 Misc.2d 92, 194 N.Y.S.2d 644, 648 (Erie Co.1959), *aff'd* 11 A.D.2d 1084, 208 N.Y.S.2d 443 (4th Dep't 1960), where an employee assumes a position of trust and confidence such as manager of the business and cannot then abuse that position by planning his own competitive business during working hours, carrying out that plan in whole or in part while still so employed, and thereby benefitting to his employer's detriment after that employment is terminated. *See also E.W. Bruno Co. v. Friedberg*, 21 A.D.2d 336, 250 N.Y.S.2d 187 (1st Dep't 1964); *Witkop & Holmes Co. v. Boyce*, 61 Misc. 126, 112 N.Y.S. 874, 878 (1908), *aff'd* 131 A.D. 922, 115 N.Y.S. 1150 (1909).

In the instant case, no competition between employee and employer has been alleged or even suggested. Dudley and Egler did not solicit customers from the parent company, Union Carbide, or the Home and Automotive division thereof. They merely helped to procure a favorable disposition of a division which was being terminated or sold. Indeed, rather than enfeebling their division and the business of their employer, they facilitated it by soliciting sale to an able purchaser which

would be in a position to carry on the business, along with its employees, as undisturbed and as profitably as possible under circumstances imposed on these employees by no choice or fault of their own.

■ Moreover, Dudley and Egler were entitled to share their trade information with First Boston representatives, in the absence of specific agreement or orders to the contrary, or a trade secret, none of which are present here. Plaintiffs do not contend that these individuals disclosed trade secret or otherwise prohibited information to First Boston, but only that whatever information they gave should have been disclosed to *all* of the bidders. The Court will not elevate this appealing argument for equal access, to the level of some sort of a legal duty to be imposed on these defendants. Dudley and Egler had a perfectly good faith basis to act on their own behalf and tell their co-adventurers at First Boston non trade secret information. The Court infers that these defendants possessed the usual information and suggestions for improvement, ideas which every manager has conceived and which higher corporate command has so often inhibited. This is precisely the kind of information an employee can utilize for his own benefit when he must leave, and may share freely with others if he so chooses.

*Personal Jurisdiction for State Law Claims*

Individual defendants Dudley and Egler seek dismissal of the state law claims made against them on the grounds that this Court lacks personal jurisdiction over them with respect to these claims. These defendants argue that the New York fiduciary shield doctrine, which, if applied, renders non-domiciliary corporate employees whose New York business activities are conducted on behalf of a corporate employer not subject to personal jurisdiction under New York's long-arm statute, N.Y.CPLR § 302(a), should be applied by this Court based upon the particular facts of this case. *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 903 (2d Cir.1981).

The plaintiffs contend that the fiduciary shield doctrine does not apply in the instant case because many of the business contacts made within New York by Dudley and Egler were unrelated to their positions as employees of Union Carbide, and, furthermore, because Dudley and Egler were acting in their own self-interest, rather than that of their employer. The plaintiffs list several meetings attended by Dudley and Egler in New York City as evidence of activity unrelated to their positions as Union Carbide employees, including: 1) a meeting, which took place at First Boston's offices in late May or early June of 1986, concerning the public offering of 12½% senior subordinated debentures to be used to finance the acquisition of Carbide's Home & Automotive division by First Boston (Dudley Tr. 193); 2) a series of meetings of First Boston's Board of Directors which took place from June through November of 1986 (Egler Tr. 51; Dudley Tr. 154–55); and 3) a meeting, held at the offices of Manufacturers Hanover Trust Company ("Manufacturers Hanover") in late May or early June of 1986, at which about 75 bankers from locations throughout the United States were in attendance, in connection with financing of the acquisition of the H & A division by First Boston (Egler Tr. 52–54; Dudley Tr. 152–53). The plaintiffs also refer to meetings of Dudley and Egler with Morgan Stanley during the time of the competitive bidding process, during which Dudley and Egler were acting, allegedly, in their own interests and in the interests of First Boston, as evidence of transaction of business within the State of New York to which the fiduciary shield doctrine should not apply (Egler Tr. 49–51).

Other alleged activities by Dudley, which are not mentioned by either party in the context of the issue of New York long-arm jurisdiction, but which are significant for purposes of discussion of this jurisdictional issue, include his participation in a series of secret meetings with representatives of First Boston commencing in January of 1986, at which First Boston allegedly obtained information from Dudley and Egler which resulted in special advantages to First Boston in the competitive bidding pro-

cess. The plaintiffs do discuss in the context of the jurisdictional issue, their claim that Dudley attended the closing of the H & A division acquisition in July of 1986 (Dudley Tr. 402–03) and later described his role at the closing as that of a "representati[ve of] First Brands in all of its functions and activities" (Dudley Tr. 402–03). The plaintiffs also specifically refer to negotiations between Dudley and Manufacturers Hanover concerning a personal loan to be used by Dudley to finance his purchase of First Brands stock (Dudley Tr. 151–53). It is well pleaded and the Court infers, that if First Boston was the successful bidder, Dudley and Egler, as well as the remainder of the H & A management, would acquire equity ownership in the new vehicle, the financing for which First Boston was helping them to procure. Thus, Dudley and Egler were involved in, and acting in behalf of, both sides of the bargaining table.

Apparently, both Dudley and Egler had personal interests which would be served by a successful result for First Boston in the bidding process, and the Court assumes that these interests existed from the earliest time at which Dudley and Egler became aware of Carbide's intentions to procure a sale of the Home and Automotive Products business. These included the following assurances allegedly made by First Boston, all of which were conditioned upon First Boston's success in the bidding process: 1) the likelihood of retaining the H & A Division's existing management (including both individual defendants), 2) equity ownership of the H & A division by its management on very favorable terms, 3) an understanding that Dudley would become chairman of the board and president of First Brands. The Court concludes that these personal interests motivated, at least in part, Dudley's and Egler's actions with respect to First Boston and the sale of the division thereto.

■ The issue before this Court in this connection is whether the individual defendants are subject to personal jurisdiction under New York's long-arm statute, CPLR § 302(a), with respect to the state claims against them. This Court concludes that such jurisdiction may be exercised over defendants Dudley and Egler.

■ Personal jurisdiction is determined by the law of the forum in which the federal district court sits, *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757 (2d Cir.1983); *Arrowsmith v. United Press International,* 320 F.2d 219, 223 (2d Cir.1963) (en banc); with the exception of federal securities claims under § 22 of the 1933 Act and § 27 of the 1934 Act, 15 U.S.C. §§ 77v, 78aa, which have been herein dismissed. Although the plaintiff must ultimately establish jurisdiction over the defendant by a preponderance of the evidence, plaintiff need only make a prima facie showing, based upon the pleadings and affidavits, that jurisdiction exists, prior to any evidentiary hearing which may be held on the issue or a trial on the merits. *Hoffritz for Cutlery, Inc. v. Amajac, Ltd.,* 763 F.2d 55, 57 (2d Cir.1985); *Cutco Industries v. Naughton,* 806 F.2d 361 (2d Cir.1986); *Marine Midland Bank, N.A.,* 664 F.2d at 904, *United States v. Montreal Trust Co.,* 358 F.2d 239, 242 (2d Cir.), *cert. denied,* 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966). The pleadings and affidavits are to be construed in the light most favorable to plaintiffs and all doubts are to be resolved in the plaintiff's favor. *Cutco Industries,* 806 F.2d at 365; *Hoffritz for Cutlery, Inc.,* 763 F.2d at 57, *Beacon Enterprises, Inc. v. Menzies,* 715 F.2d 757, 768 (2d Cir.1983); *Marine Midland Bank, N.A.,* 664 F.2d at 904. Therefore, in making its determination as to personal jurisdiction over the individual defendants in the instant case, this Court must assume that the facts alleged by the plaintiffs are true.

CPLR § 302(a) outlines the alternate methods by which personal jurisdiction over non-domiciliary defendants, or long-arm jurisdiction, may be established in a court sitting in the State of New York:

"As to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any non-domiciliary, or his executor or administrator, who in person or through an agent:

1. transacts any business within the state or contracts anywhere to supply goods or services in the state; or

2. commits a tortious act without the state, except as to a cause of action for defamation of character arising from the act; or

3. commits a tortious act without the state causing injury to person or property within the state, except as to a cause of action for defamation of character arising from the act, if he

(i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or

(ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce; or

4. owns, uses or possesses any real property situated within the state."

Plaintiffs do not assert the existence of personal jurisdiction over the individual defendants in this case on the basis of subsections 2 or 4 of § 302(a). As the Court concludes that personal jurisdiction over these individual defendants may be established on the basis of § 302(a)(1) or (2), asserted by the plaintiffs herein, this Court will not consider the applicability of the alternate subsections to the circumstances of this case.

Subsection 3 of the New York long-arm statute requires that the cause of action arise from commission of a tortious act without the state which causes injury to persons or property within the state. Here, plaintiffs allege that Dudley and Egler committed acts outside New York which injured the Rights holders within the state. Without drawing a conclusion as to the merits of this claim, this Court assumes, as it must, that the allegation is true for the purposes of this analysis. Therefore, plaintiffs have met the first requirement for the establishment of a prima facie case for personal jurisdiction under § 302(a)(3).

To meet the additional jurisdictional requisite under § 302(a)(3)(i), the plaintiffs allege that these individual defendants regularly did business and engaged in a persistent course of conduct in the State of New York. In support of this allegation, plaintiffs refer to portions of the record referring to the personal loan allegedly negotiated by Dudley (Dudley Tr. 152–53), visits made by Dudley to New York for purposes of leisure and entertainment (Dudley Tr. 186–88), Dudley's presence and participation in the closing of the H & A division acquisition by First Boston (Dudley Tr. 190–95), the participation by Dudley and Egler in the meeting of about 75 bankers at the offices of Morgan Stanley (Egler Tr. 29–33), and the individual defendants' presence at other meetings held at Morgan Stanley's offices between January and April of 1986 (Egler Tr. 49–51).

This Court finds that this listing of business activities, as derived from the record by plaintiffs, is sufficient to support a conclusion that Dudley and Egler did do business and engaged in a persistent course of conduct in the State of New York within the meaning of § 302(a)(3)(i). Therefore, unless this Court elects to apply the equitable remedy of the fiduciary shield doctrine, plaintiffs have made a prima facie showing of the existence of personal jurisdiction over the individual defendants under § 302(a)(3).

In the alternative, plaintiffs argue that the state claims against the individual defendants arise from the transaction of business within New York by Dudley and Egler, thereby meeting the criteria necessary to establish personal jurisdiction over these defendants under CPLR § 302(a)(1). *See Cutco Industries,* 806 F.2d at 365. Plaintiffs refer to meetings held at Morgan Stanley during the time of the bidding process (*See* Egler Tr. 49–51), during which the individual defendants allegedly injured the Rights holders in the process of seeking special advantages for themselves. This Court must determine whether these activities of the individual defendants constitute "transacting business" within the meaning of subsection 1 of the New York long-arm statute.

For purposes of determining whether New York long-arm personal jurisdiction may be exercised, "transacting business" has been found to include such activity as attendance at meetings held within the forum state. *American Contract Designers, Inc. v. Cliffside, Inc.*, 458 F.Supp. 735, 739 (S.D.N.Y.1978); *but c.f., Pneuma-Flo Systems, Inc. v. United Universal Machinery Corp.*, 454 F.Supp. 858, 866 (S.D. N.Y.1978) (meetings not essential to the ongoing relationship between the parties do not constitute transacting business). Here, the record establishes that both Dudley and Egler attended a series of meetings, including those held at Morgan Stanley's offices and other meetings described previously, which give rise in part to the alleged injuries of the Rights holders. This Court determines that the attendance by Dudley and Egler of the meetings described above constitutes the transacting of business within the State of New York. Accordingly, in the absence of application of the fiduciary shield doctrine, it must be concluded that plaintiffs have also made a prima facie case for personal jurisdiction over the individual defendants under subsection 1 of the New York long-arm statute. CPLR § 302(a)(1).

The Court now turns to the argument raised by defendants Dudley and Egler, that neither individual defendant is subject to personal jurisdiction in New York because they are entitled to the equitable protection afforded by the fiduciary shield doctrine. Because the fiduciary shield doctrine is both controversial and unrefined in its nature, an explanation of its development and previous application is warranted.

The fiduciary shield doctrine insulates corporate employees from personal jurisdiction under CPLR § 302(a) if their contacts with the state are made in their corporate, rather than their personal, capacities. *Marine Midland Bank, N.A.*, 664 F.2d at 902; *Lehigh Valley Industries, Inc. v. Birenbaum*, 527 F.2d 87 (1975). The rationale for the doctrine is that it would be unfair to exercise personal jurisdiction over a defendant in a forum state in which he or she does not reside and where his or her only contacts consist of acts performed for the benefit of his or her employer rather than for personal benefit. *Marine Midland Bank, N.A.*, 664 F.2d at 902. Thus, the fiduciary shield doctrine is an equitable doctrine which is to be applied based upon an examination of the particular facts of a given case with a view toward overall fairness. *Id.* at 903. The doctrine has been adopted by the New York State courts. *See, e.g., Laufer v. Ostrow*, 55 N.Y.2d 305, 313, 449 N.Y.S.2d 456, 434 N.E.2d 692 (1982).

The fiduciary shield doctrine has been the subject of denunciation. Judge McLaughlin has said of the doctrine: "There is little policy, and even less logic to commend it." J. McLaughlin, Practice Commentaries, N.Y.CPLR § 301, C302:3 (McKinney 1982). He also writes: "What policy is served by immunizing a corporate officer who acts in the interest of his corporate master—other than a vague sense of unfairness—eludes this writer." *Id.* Finally, Judge McLaughlin observes: "It bears emphasis that there is no dispute that the individual is liable for the acts he performs in New York. The anomaly is that he has to be sued somewhere else to enforce that liability." *Id.* Thus, if an individual defendant is liable for acts performed in New York, and his or her corporate employer is liable for that same activity and is subject to the jurisdiction of a court sitting in New York, the practical effect of the application of the doctrine would be that one tortious act could generate at least two separate court actions in at least two jurisdictions rather than a consolidated action in one jurisdiction against both a corporation and its employee.

The breadth of discretion the court is permitted to exercise in determining whether to apply the doctrine is unclear. It is apparently perceived that the doctrine may be applied to all three subsections of CPLR § 302(a). *See, e.g., Goshen Litho, Inc. v. Kohls*, 582 F.Supp. 1561, 1565 (S.D.N.Y. 1983) (doctrine applies when personal jurisdiction is asserted under § 302(a)(1)); *Lancer Products, Inc. v. Rally Accessories, Inc.*, 597 F.Supp. 440, 442 (E.D.N.Y. 1984) (doctrine applies to § 302(a)(2)); *Shel-*

don v. Kimberly-Clark Corp., 482 N.Y. S.2d 867, 869 (2d Dep't 1984), *dismissed*, 65 N.Y.2d 691 (1985) (doctrine applies to assertions of personal jurisdiction under § 302(a)(3)). It is less clear, however, how broad the discretion of the court is in applying the doctrine under the particular circumstances of a given case. Certain cases appear to limit the doctrine to circumstances under which an individual corporate employee performs acts in New York solely in his corporate capacity. *See, e.g., Lehigh Valley Industries, Inc.*, 527 F.2d at 92–93. Other cases have employed a more flexible approach to the doctrine. *See, e.g., Cantor v. Life Alert*, 655 F.Supp. 673, 679 (S.D.N.Y.1987); *Laurenzano v. Goldman*, 465 N.Y.S.2d 779, 780 (2d Dep't 1983). One case interprets the appropriate determination to be whether the defendant was acting primarily in the employer's best interest, or was acting largely out of self-interest. *Thomson McKinnon Securities v. Hamiltonian Industries, Inc.*, 610 F.Supp. 5, 8 (S.D.N.Y.1985).

The cases all proscribe use of the fiduciary shield doctrine under two sets of factual circumstances. The first circumstance under which the doctrine is clearly not applicable occurs where a corporation is a mere shell for its sole owner. There, it would not be appropriate to invoke this equitable doctrine to protect the individual from personal jurisdiction based upon his or her actions as employee-owner. *Marine Midland Bank, N.A.*, 664 F.2d at 903. Nor can the doctrine be applied to a corporate employee who diverts corporate funds for his own personal use. *United States v. Montreal Trust Co.*, 358 F.2d 239, 243 (2d Cir.), *cert. denied*, 384 U.S. 919, 86 S.Ct. 1366, 16 L.Ed.2d 440 (1966).

The cases do not indicate clearly, however, that the doctrine must apply under circumstances other than those involving a shell corporation or a diversion of corporate funds for personal use. Indeed, many of the cases interpret the doctrine as applicable only to those circumstances in which the individual defendant's contacts with the state were made in his or her capacity as a fiduciary of a corporation, rather than out of personal interest. *Goshen Litho, Inc.*,

582 F.Supp. at 1565; *Bulk Oil (USA) Inc. v. Sun Oil Trading Co.*, 584 F.Supp. 36, 41 (S.D.N.Y.1983); *Barrett v. United States*, 646 F.Supp. 1345, 1354 (S.D.N.Y.1986); *Lehigh Valley Industries, Inc.*, 527 F.2d at 92–93; *Laurenzano*, 465 N.Y.S.2d at 779. Other cases suggest that there is no reason not to apply the doctrine if there is no suggestion that a defendant is engaged in self-dealing or that the corporation involved is a mere shell. *Bulk Oil (USA) Inc.*, 584 F.Supp. at 40 n. 7; *Thomson McKinnon Securities, Inc.*, 610 F.Supp. at 8. Because there is no assertion by the plaintiffs that Union Carbide or First Brands is a mere shell, this justification for application of the doctrine does not herein apply. The proposition which thus emerges by implication is that the involvement of an individual defendant in self-dealing will defeat application of the fiduciary shield doctrine.

The Court, therefore, must examine the plaintiffs' pleadings in order to determine whether the plaintiffs have made a prima facie showing that the individual defendants were engaged in self-dealing during the times they attended meetings in New York. If any suggestion of self-dealing is made by the plaintiffs' Complaint and other documents submitted to this Court, the fiduciary shield doctrine will not be applied.

Examining the plaintiffs' Complaint and the record of this case, this Court cannot assert, as a matter of law, that there is no suggestion that Dudley and Egler were engaged in self-dealing. Indeed, the plaintiffs claim that the individual defendants' business activities, including attendance at the meetings held at First Boston to discuss financing of the acquisition, presence at the board meetings of First Brands, and participation in the meeting of about 75 bankers to discuss bank financing for First Brands, were motivated by defendants' self-interest. Because both Dudley and Egler were in positions in which their involvement in these meetings could result in personal gain in the form of continued employment by and equity interest in First Brands, the Court concludes that the plaintiffs have made a prima facie

case that both individual defendants were motivated to some degree by personal interest in attending these meetings. In Dudley's case, this inference is further supported by his statement that he represented First Brands at the July 1986 closing, and by his negotiations for a personal loan from Manufacturers Hanover at a meeting of bankers also attended by Egler.

The plaintiffs also claim that, during the bidding process, Dudley and Egler attended a series of meetings with Morgan Stanley in an attempt to put both First Boston and themselves in an advantageous position with respect to the acquisition of the H & A division from Union Carbide. Additionally, the plaintiffs allege that Dudley participated in a series of secret meetings with First Boston beginning in January of 1986 to discuss how First Boston might secure an advantageous position in the competitive bidding process. Because the plaintiffs make the plausible claim that both Dudley and Egler were motivated by self-interest in the form of assurances of continued employment in and equity ownership of First Brands, these claims also suggest that self-interest was at least a part of the individual defendants' purpose for attending the meetings. The Court concludes, for the purposes of personal jurisdiction, that the plaintiffs have made a prima facie showing that Dudley's and Egler's participation in the meetings was motivated, at least in part, by a desire to further their own personal interests, and not merely by their fiduciary duties to Union Carbide.

Even if this Court were to find, as the individual defendants urge, that some or all the New York business activities in which Dudley and Egler engaged were pursued in a fiduciary capacity as "future employees" of First Brands, the prima facie evidence of self-interest would not be overcome by such a conclusion. Therefore, this Court will not reach the rather novel issue of whether the fiduciary shield doctrine is available as an equitable protection from personal jurisdiction for persons intending to become future employees of a corporation.

Because a prima facie showing has been made of personal interest as a purpose in Dudley's and Egler's business conduct and the principles of fairness, whatever they are, will not be contravened, there is no basis for application of the fiduciary shield doctrine in this case. Accordingly, the motion to dismiss the state law claims against the individual defendants by reason of lack of personal jurisdiction is denied.

*Pendent Jurisdiction*

■ However, this Court concludes that, in view of its dismissal of the federal securities claims against Dudley and Egler, the Court has no basis upon which to exercise pendent jurisdiction as to the state law claims, namely, breach of contract, breach of fiduciary duty, fraud and deceit, negligent misrepresentation, and conspiracy and/or aiding and abetting in the above, which appear in Counts Four through Eight. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). The Supreme Court guides us with its instruction that: "Certainly, if the federal claims are dismissed before trial, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *Id.* at 726.

Our Court of Appeals has held that the retention of jurisdiction for trial of a pendent state law claim on the basis of a federal claim already disposed of by dismissal for failure to state a claim upon which relief can be granted would be an abuse of discretion absent unusual circumstances suggesting some prejudice arising from relegating the case for trial in the state court. *Nolan v. Meyer*, 520 F.2d 1276 (2d Cir.), *cert. denied*, 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975). No such unusual or prejudicial circumstances are herein involved. Since this Court has dismissed the plaintiffs' federal claims for failure to state a claim, we will avoid making "[n]eedless decisions of state law." *Girard v. 94th St. & Fifth Ave. Corp.*, 530 F.2d 66 (2d Cir.), *cert. denied*, 425 U.S. 974, 96 S.Ct. 2173, 48 L.Ed.2d 798 (1976), *citing United Mine Workers of America v. Gibbs*, 383 U.S. at 726, 86 S.Ct. at 1138. *See generally* 13B C.

Wright & A. Miller, Federal Practice & Procedure § 3567.1 (1984).

Accordingly, exercising its discretion, the Court dismisses plaintiffs' pendent state claims without addressing the sufficiency, if any, of these claims. The motion of defendants Dudley and Egler is granted in its entirety, and all claims against them are hereby dismissed.

Counsel for the respective parties may, if so advised, consider together and advise the Court whether the finding contemplated by Rule 54(b), F.R.Civ.P., would be appropriate at this time.

So Ordered.